**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 4 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MYRON HULEN, individually,

    Plaintiff - Appellee,

v.

ALBERT YATES, President; DANIEL
D. COSTELLO, Dean of the College
of Business, and other co-conspirators
whose identities are presently
unknown,

    Defendants - Appellants.

 and

LOREN CRABTREE, Provost,

    Defendant.

No. 01-1530

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 98-B-2170)**

---

Jay S. Jester, Miller & Jester, L.L.C., Denver, Colorado, for Plaintiff - Appellee.

Cathy Havener Greer (Pamela Skelton and L. Michael Brooks, Jr., with her on the
briefs), Wells, Anderson & Race, L.L.C., Denver, Colorado, for Defendants -
Appellants.

---

Before **KELLY**, **McKAY**, and **HARTZ**, Circuit Judges.

**PER CURIAM**.

Defendants-Appellants, two state university officials, appeal from the district court's denial of qualified immunity. We have jurisdiction over this interlocutory appeal under the qualification of the final judgment rule of 28 U.S.C. § 1291 announced in Mitchell v. Forsyth, 472 U.S. 511 (1985), and we affirm in part and reverse in part.

Background

The following facts are drawn from the complaint and summary judgment materials. Plaintiff-Appellee Myron Hulen is a tenured faculty member at Colorado State University ("CSU"). He was appointed as an assistant professor in the Department of Accounting and Taxation (now the Accounting Department) in 1989. His field is taxation. Beginning in 1995, Dr. Hulen cooperated with other members of the Accounting Department in seeking to revoke the tenure of a colleague (Dr. William Mister) on grounds of plagiarism and copyright violations, emotional abuse of students, abuse and harassment of staff, misuse of state funds, receipt of kickbacks from a publisher in return for adopting textbooks, and other charges. Administrators at CSU allegedly threatened Dr. Hulen and other

Accounting Department faculty members pursuing the charges against Dr. Mister. The alleged threats were delivered by then-Accounting Department Chair Michael Moore, who advised that his message was from the CSU Administration. Several adverse actions were threatened unless the charges against Dr. Mister were dropped, including termination of the Masters of Accounting (M.S.) degree program, assignment of the professors to teach courses outside their areas of expertise, transfer of the professors to other departments, and eventual termination of the professors due to overstaffing if the graduate program were eliminated.

Ultimately, a special university committee recommended that Dr. Mister's tenure be retained, but it did so without considering evidence beyond the initial charges and without interviewing those Accounting Department professors substantiating the charges. Unable to achieve harmony in the Accounting Department, and "determined not to live Professor Mister's nightmare," Dr. Moore resigned as chair and later left CSU. Aplt. App. 564. In July 1996, Dr. Costello became the Dean of the College of Business, and, after learning of the more than six years of divisiveness and dysfunction within the Accounting and Taxation Department, he proposed transferring three of four tax faculty out of the Department and changing the name to the Accounting Department. In the summer of 1997, Dr. Hulen was transferred involuntarily from the Accounting Department

into the Management Department,[1] Aplt. App. 262, in which he is not, he claims, qualified to teach any courses and thereby resulting in a diminished ability to attract research funds, publish scholarship, receive salary increases, teach summer tax classes, and obtain reimbursement for professional dues and journal subscriptions. Aplt. App. 471-72. As we discuss in depth later, Dr. Hulen aired his professional concerns about being removed from the Accounting Department to Dean Costello several times before he was transferred. Aplt. App. 242, 243, 244-46. Dr. Hulen contends that he was notified in May 1998 that could only teach two classes, both in tax, in the Accounting Department in any given year. Aplt. App. 471. He further contends that adjunct staff and temporary faculty have been hired to teach the courses he normally teaches. Aplt. Br. tab E at 8, ¶ 24.

In response to the transfer, Dr. Hulen filed two grievances. At CSU, a "Class A" grievance involves the assertion of impairment of a constitutional right that requires due process. Aplt. App. 195. The burden of proof with a Class A grievance is on the CSU administrator initiating the challenged decision. Id. A "Class B" grievance involves a term or condition of employment not covered by the Class A category, and the burden of proof is on the grievant. Id. In his first grievance, Dr. Hulen claimed that he should have been provided a pre-deprivation

---

[1] Three of the other Accounting Department members who sought the revocation of Dr. Mister's tenure were transferred to three different departments within the College of Business.

hearing before being transferred to the Management Department. Aplt. App. 472, ¶ 23. The grievance committee concluded that the grievance was a Class B grievance and Dr. Hulen was not entitled to a pre-deprivation hearing. Aplt. App. 95, 533. Dr. Hulen's second grievance claimed that his involuntary transfer deprived him of a property interest and was in retaliation for constitutionally protected free speech. Aplt. App. 472, ¶ 24. The grievance committee ruled that the grievance was a Class B grievance, acknowledged that there was an inference of punitive motivation, but decided that Dean Costello "had reason to act independently of possible retaliatory motives." Aplt. App. 543-44. Apparently rejecting the First Amendment claim, the committee determined that the transfer was not in accordance with the CSU Faculty Manual ("Faculty Manual") which requires mutual agreement for such a transfer. In determining that Dean Costello's action "was unfair, unreasonable and discriminatory," the committee noted that "it removes Dr. Hulen from fundamental faculty rights enjoyed by faculty who remain in the Department of Accounting." Aplt. App. 544.

The grievance committee's decision was reviewed by Provost Loren Crabtree, who decided that, while the grievance was properly classified as Class B, the decision of the grievance committee was unreasonable. Aplt. App. 95-103. CSU President Albert Yates accepted the decision of the provost upon appeal by Dr. Hulen. Aplt. App. 559-61. Dr. Hulen then appealed to the State Board of

- 5 -

Agriculture (the governing body of CSU) which upheld Dr. Yates' decision.

Dr. Hulen filed suit under 42 U.S.C. § 1983 in 1998 against the State Board of Agriculture, CSU, President Yates, Provost Crabtree, and Dean Costello alleging that his transfer to the Management Department was in retaliation for his "whistle blowing" and public allegations against Dr. Mister and that the transfer deprived him of a property interest (an appointment in the Accounting Department) without due process. He sought damages and injunctive relief. On March 14, 2000, the district court dismissed Dr. Hulen's suit against CSU and the State Board of Agriculture on both Eleventh Amendment immunity and § 1983 interpretive grounds, holding that neither the University nor the Board are "person[s]" under § 1983.

Dr. Hulen's First and Fourteenth Amendment claims against the three remaining defendants (President Yates, Provost Crabtree, and Dean Costello) in both their official and individual capacities were the subject of a subsequent order by the district court on October 12, 2001. That order is the subject of this appeal. As to Dr. Hulen's First Amendment claims, the court ruled that (1) the claims against President Yates and Dean Costello in their official capacities may proceed to trial but that no monetary damages may be awarded based upon Ex Parte Young, 209 U.S. 123 (1908), (2) the claim against President Yates in his individual capacity may proceed to trial but that no monetary damages may be

- 6 -

awarded based upon quasi-judicial immunity, and (3) the claim against

Dean Costello in his individual capacity may proceed to trial, rejecting Dean

Costello's assertion of qualified immunity. The court also (4) dismissed both the

official capacity and individual capacity claims against Provost Crabtree for lack

of personal participation. As to the Fourteenth Amendment claims against the

individual Defendants in their official capacities, the court granted summary

judgment for Dr. Hulen against all three individual Defendants but ruled that no

monetary damages may be awarded, again based upon Ex Parte Young. Finally,

the court also granted summary judgment for Dr. Hulen against all three

individual Defendants in their individual capacities on the Fourteenth Amendment

claims. The court rejected Dean Costello's assertion of qualified immunity, but

the court ruled that no monetary damages may be sought against President Yates

or Provost Crabtree based on quasi-judicial immunity.

On appeal, President Yates and Dean Costello argue the following

regarding qualified immunity on Dr. Hulen's claim of First Amendment

retaliatory transfer for speech on a matter of public concern: (1) there was no

constitutional violation because (a) the alleged speech was not on a matter of

public concern, (b) their interests as administrators outweigh any marginally

protected speech of Dr. Hulen, (2) the law was not clearly established in the

necessary, particularized sense. They also argue that (3) Dr. Hulen cannot show

- 7 -

any personal participation by these Defendants in the alleged retaliatory transfer because of his motivation.

On the issue of qualified immunity for a Fourteenth Amendment deprivation of a property interest, they argue that (1) there was no constitutional violation because (a) Dr. Hulen does not process a valid property interest in a departmental assignment, (b) Dr. Hulen received all process which is due, (2) Dean Costello was entitled to qualified immunity because the law was not clearly established. Even assuming that Dr. Hulen had established a claim of constitutional proportions against Dean Costello, they argue that the district court erred in determining that there is no issue of fact concerning Dean Costello and this claim.

## Discussion

A.  Jurisdiction over Interlocutory Appeal of Denial of Qualified Immunity

Defendants Yates and Costello seek review of the district court's denial of their motions for summary judgment on grounds of qualified immunity. Despite the "final judgment rule" of 28 U.S.C. § 1291, the federal courts of appeal have jurisdiction, under certain conditions, to hear an interlocutory appeal of a denial of qualified immunity. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns

- 8 -

on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."); Bass v. Richards, 308 F.3d 1081, 1086 (10th Cir. 2002) ("[D]enial of a summary judgment motion . . . is subject to appeal . . . when the defendants are public officials asserting a qualified immunity defense and the appealed issue is whether a given set of facts establishes that defendants violated clearly established law.") (citation omitted). An important restriction on the jurisdiction of the appellate courts over interlocutory appeals of denials of qualified immunity is that review is limited to matters of law and may not turn on questions of evidentiary sufficiency. See Johnson v. Jones, 515 U.S. 304, 313-18 (1995). Although qualified immunity is separate from the merits of the action under the collateral order doctrine, "a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue." Johnson v. Fankell, 520 U.S. 911, 917 n.5 (1997).

The Mitchell rule governing appellate jurisdiction over interlocutory appeals of denials of qualified immunity is complicated in this case by (1) the district court's entry of summary judgment in favor of the Plaintiff, Dr. Hulen, on his due process claims, and (2) the particular grounds raised by these Defendants in support of qualified immunity at the district court. As a result of the first circumstance, Dr. Hulen has filed a motion to dismiss those aspects of the appeal for lack of jurisdiction on the grounds that the qualified immunity issue is moot.

According to Dr. Hulen, the individual Defendants will not stand trial on the due process claim regardless of the outcome of this appeal, and an aspect of the underlying justification for the Mitchell rule is avoiding litigation. See Mitchell, 472 U.S. at 525-27. Thus, the argument is that the present appeal should be dismissed insofar as it calls for review of qualified immunity on the due process claim.

We are not persuaded. The entry of summary judgment in favor of Dr. Hulen on the due process claim does not preclude this court from examining the district court's rulings denying qualified immunity. After all, a reversal would result in the two individual Defendants obtaining relief (immunity from suit) on the damages claims without further proceedings. We limit this appeal, then, to the denials of qualified immunity to President Yates and Dean Costello on Dr. Hulen's Fourteenth Amendment claims against them in their individual capacities, and the denial of qualified immunity to Dean Costello on Dr. Hulen's First Amendment claims against Dean Costello in his individual capacity.[2] President Yates sought qualified immunity only on the factual grounds that he did not personally participate in any First Amendment deprivation, Aplt. App. 606-07,

---

[2]Whether due to a fault in the pleadings or in the court's analysis of qualified immunity, the district court's order also denies qualified immunity to Costello in his official capacity. Aplt. Br. tab A at 29. Qualified immunity, of course, only insulates defendants sued under § 1983 in their individual capacities.

and the district court denied qualified immunity to him on this basis, Aplt. Br. tab A at 23-24; absent very unusual circumstances we do not consider qualified immunity arguments on appeal that an individual defendant neither presented to, nor on which he obtained a ruling from, the district court. Garrett v. Stratman, 254 F.3d 946, 956 (10th Cir. 2001).

We recognize that the district court granted President Yates quasi-judicial immunity for claims against him in his individual capacity, but such immunity insulates him only from monetary damages and not from the burden of litigation on the due process claim, as would a grant of qualified immunity. See Mitchell, 472 U.S. at 526-27. Adjudicating only the appeal from the denials of qualified immunity on the grounds relied upon by the district court simplifies our task in this appeal and allows for a later appeal of other issues if necessary.

B.     Qualified Immunity

Government officials who perform discretionary government functions are entitled to qualified immunity from civil damages, provided their conduct does not violate clearly established rights of which a reasonable government official would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). We review the denial of a summary judgment motion raising a qualified immunity defense de novo. See Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001). When a defendant raises the defense of qualified immunity, a plaintiff must establish that

the defendant's conduct violated a federal constitutional or statutory right and that the right was clearly established at the time of the conduct. Saucier v. Katz, 533 U.S. 194, 201 (2001); Siegert v. Gilley, 500 U.S. 226, 232 (1991).

1.  First Amendment Claim

Mr. Hulen's First Amendment claim rests on the assertion that state actors may not "condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression," Connick v. Myers, 461 U.S. 138, 142 (1983), and "cannot retaliate against an employee for exercising his constitutionally protected right of free speech." Dill v. City of Edmond, 155 F.3d 1193, 1201 (10th Cir. 1998). In evaluating this type of claim, it is essential to identify the speech which resulted in the alleged retaliation. Here, we read Dr. Hulen's complaint as encompassing his speech in support of administrative revocation of tenure of Dr. Mister and his speech refusing to withdraw his support for such an investigation despite the university's opposition. Aplt. Br. tab E at 8, ¶¶ 29, 30.

A four-part test for evaluating a constitutional claim for First Amendment retaliation derives from Connick, 461 U.S. at 147, Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977), and Pickering v. Bd. of Educ., 391 U.S. 563 (1968). The first step is to determine whether the speech is protected, i.e., on a matter of public concern. If so, the second step is to balance

the employee's interest in commenting on matters of public concern against the government employer's interest in promoting efficient government services. If that balance is struck in favor of the employee's interest, the third step requires the employee to demonstrate that his speech was a substantial or motivating factor in the adverse employment action. If the employee so demonstrates, the fourth step considers whether the government employer has proven that it would have taken the same adverse employment action, even in the absence of the protected speech. See Dill, 155 F.3d at 1201-1202 (stating four-part test). "The first two steps are legal questions which the court resolves to determine whether the speech is constitutionally protected. The second two steps concern causation and involve questions of fact." Id. at 1202 (citation omitted).

"Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of [state] officials, in terms of content, clearly concerns matters of public import." Conaway v. Smith, 853 F.2d 789, 796 (10 th Cir. 1988). In deciding whether an employee's speech touches on a matter of public concern, or constitutes a personal grievance, courts look at the "content, form and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. They also consider the motive of the speaker–was the speech "calculated to redress personal grievances or [did it have] a broader public purpose[?]"). Gardetto v. Mason, 100 F.3d 803, 812 (10th Cir. 1996). Here, Dr.

Hulen attempted to bring his concerns about Dr. Mister to the CSU Administration, and stated in response to threats that if the charges were withdrawn, he would personally refile them. Aplt. App. 467-469, ¶¶ 6, 10. He wrote memos to the provost about the lack of investigation that generated the recommendation that Dr. Mister's tenure not be revoked and requested an investigation of the alleged threats made against the Accounting Department professors. Aplt. App. at 509-511; 525-28 ("Yet the very cornerstone of our profession of accounting involves ethical behavior and integrity. We cannot successfully teach ethics if it is not practiced at CSU."). The speech in this case fairly relates to charges at a pubic university that plainly would be of interest to the public, e.g., plagiarism and copyright violations, emotional abuse of students, abuse and harassment of staff, misuse of state funds, receipt of kickbacks from a publisher in return for adopting textbooks, and a claimed inadequate investigation of the allegations and alleged retaliation against those who made the allegations. See Maples v. Martin, 858 F.2d 1546, 1553 (11th Cir. 1988) ("[T]eachers whose speech directly affects the public's perception of the quality of education in a given academic system find their speech protected [under the First Amendment].").

Dean Costello contends that Dr. Hulen merely sought to establish internal harmony in the Accounting and Taxation Department by his speech, not bring to

- 14 -

light governmental wrongdoing. Aplt. Br. at 23 (citing Aplt. App. at 335-36). Of course, speech relating to an internal department dispute will normally be classified as a personal grievance outside of public concern. Connick, 461 U.S. at 147; Finn v. New Mexico, 249 F.3d 1241, 1247 (10th Cir. 2001) (speech pertaining to internal personnel disputes and working conditions is not speech on a matter of public concern). Dr. Hulen testified on deposition that while he knew that filing tenure revocation charges against Dr. Mister would be divisive in the short run, in the long run it would lead to greater harmony in the Department because most of the problems were attributable to that issue. Aplt. App. at 335-36. The fact that Dr. Hulen might receive an incidental benefit of what he perceived as improved working conditions does not transform his speech into purely personal grievances. Moreover, speech which touches on matters of public concern does not lose protection merely because some personal concerns are included. Connick, 461 U.S. at 149 ("Because one of the questions in Myers' survey touched upon a matter of public concern and contributed to her discharge, we must determine whether Connick was justified in discharging Myers."); Finn, 249 F.3d at 1248. We conclude that Dr. Hulen's speech relates to matters of public concern.

As to the second step, we balance Dr. Hulen's right to speak out about this matter with whether exercise of that right "impairs discipline by superiors or

- 15 -

harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987). In this context, we also acknowledge the "freedom of a university to make its own judgments as to education," Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 312 (1978) (Powell, J., concurring), including who may teach what subjects, Sweezy v. New Hampshire, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in result). See also Miles v. Denver Pub. Schs., 944 F.2d 773, 778-79 (10th Cir. 1991).

Defendants consistently have argued that this case is controlled by the four-part analysis discussed above. Aplt. Br. at 22 (citing Lybrook v. Members of Farmington Mun. Schs. Bd. of Educ., 232 F.3d 1334, 1338-39 (10th Cir. 2000)). For the balance to be struck in favor of the governmental employer, there must be some evidence of actual disruption. Finn, 249 F.3d at 1249. Although a governmental employer may sometimes rely upon predictions of disruption supported by evidence, that does not apply here because the challenged action came several months after the protected speech. See Kent v. Martin, 252 F.3d 1141, 1145-46 (10th Cir. 2001) ("That legal standard is inapplicable when an employer has allowed an employee to continue to work after the protected

expression.").

Here, we are reminded that Dean Costello was not associated with CSU until July 1996, well after some of the speech in this case and that the allegations against Dr. Mister had been resolved previously, at least from the perspective of some. Dean Costello urges that CSU's interest in carrying out its public business outweighs Dr. Hulen's marginally protected speech. Aplt. Br. at 24.

We reject the characterization that Dr. Hulen's speech is marginally protected. The allegations, if substantiated, raise serious issues about the Accounting Department, College of Business and CSU, not only with respect to their relationships with students, but also among faculty, staff, and the taxpaying public. The allegations address a matter of public concern, not mere public interest, because they involve charges of wrongdoing and malfeasance. Without question, CSU has an interest in efficient operation of its Accounting Department, and the control of factions that make governance of that department difficult. At the same time, conflict is not unknown in the university setting given the inherent autonomy of tenured professors and the academic freedom they enjoy. See Sweezy, 354 U.S. at 250 (plurality opinion); id. at 262 (Frankfurter, J., concurring in result); American Ass'n of Univ. Professors, 1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments, available at http://www.aaup.org/statements/Redbook/1940stat.htm

(last updated June 2002) . Regardless, at this point in the proceedings, the evidence is far too general to link the actual disruption of the Accounting Department to Dr. Hulen's protected speech. See Finn, 249 F.3d at 1241.

Dean Costello also argues that "every expression of the reason for [Dean] Costello's transfer of [Dr.] Hulen in August 1997 involved an attempt to resolve once and for all six years of divisiveness and dysfunction within the Department." Aplt. Br. at 23 (emphasis in original). We recognize that Dean Costello testified that there were a variety of reasons (other than the content of Dr. Hulen's protected speech) for the transfer: (1) getting the Accounting Department back on track after 8-9 years of divisiveness between the Accounting faculty and the Tax and Law faculty, (2) getting the Department to focus on the upcoming 150-hour requirement for accounting professionals, and (3) increasing the productivity of the non-tenured faculty, and (4) and finding a suitable fit between Dr. Hulen's non-accounting and interdisciplinary Ph.D and the Management Department. Aplt. App. at 106-07, 319, 320, 322. But these justifications go more to causation, and the evidentiary sufficiency concerning causation is not before us in this qualified immunity appeal.

Dean Costello next argues that the district court's conclusion that "it has been clearly established in this Circuit since 1988 that reports of dishonesty, malfeasance, impropriety, and misconduct by public officials touch on matters of

public concern and are, therefore, protected by the First Amendment," Aplt. Br. tab A at 28-29, is not sufficiently specific for qualified immunity purposes. Aplt. Br. at 25. To defeat a claim of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). It is well-established that retaliation in the form of an involuntary transfer for protected speech is prohibited. Rutan v. Republican Party of Ill., 497 U.S. 62, 75 (1990) ("We therefore determine that promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees."); Schuler v. City of Boulder, 189 F.3d 1304, 1310 (10th Cir. 1999) (involuntary transfer even with same title and responsibilities was actionable); Dill, 155 F.3d 1204-05 (transfer from detective position to patrol officer); Morfin v. Albuquerque Pub. Schs., 906 F.2d 1434, 1437 (10th Cir. 1990) (transfer to another school).

Finally, we do not resolve Defendants' claims that Dr. Hulen cannot show any personal participation by these Defendants in the alleged retaliatory transfer because of his motivation. This is an issue of evidentiary sufficiency, over which we lack jurisdiction in a qualified immunity interlocutory appeal. Aplt. Br. tab A, at 23-24, 28 (discussing evidence of personal participation requiring a trial); Johnson, 515 U.S. at 317.

2.      Fourteenth Amendment Claim

Turning to Dr. Hulen's Fourteenth Amendment claim, Dr. Hulen alleges that he was deprived of a recognized property interest (an appointment in the Accounting Department) without due process.  Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972).  Thus, constitutionally protected property interests are created and defined by statute, ordinance, contract, implied contract and rules and understandings developed by state officials.  See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985); Perry v. Sindermann, 408 U.S. 593, 601-03 (1972); Roth, 408 U.S. at 577-78; Anglemeyer v. Hamilton County Hosp., 58 F.3d 533, 536 (10th Cir. 1995).

The general rule is that "no protected property interest is implicated when an employer reassigns or transfers an employee absent a specific statutory provision or contract term to the contrary."  Anglemeyer, 58 F.3d at 539.  The general rule has been applied in cases involving the involuntary transfer of tenured university professors from one department to another where no statute or contract supported the claim of a protected property interest.  See Huang v. Bd. of Governors of the Univ. of N.C., 902 F.2d 1134, 1142 (4th Cir. 1990) ("[T]he transfer of tenured professors from one department to another, without loss of

rank or pay, does not implicate any property interest protected by the Due Process Clause."); Maples, 858 F.2d at 1551 (involuntary transfer of tenured professors "is the sort of administrative decision that is left completely to the administration's discretion"); see also Kelleher v. Flawn, 761 F.2d 1079, 1087 (5th Cir. 1985) (graduate student had no property interest in specific teaching duties prior to reassignment). As this case illustrates, the general rule is not absolute if an employee can point to a specific contractual provision and surrounding circumstances establishing a property interest.

    a.    Property Interest

The district court determined that Dr. Hulen possessed a property interest in his position as a tenured professor of the Accounting Department based upon contract, confirmed by CSU's customs and practices. Aplt. Br., tab A at 9. Dr. Hulen first was offered an appointment as an assistant professor by the Department of Accounting and Taxation and was so appointed. Aplt. App. 32-33. He was awarded tenure and promoted to associate professor of the same department. Aplt. App. 35. With that predicate, the provision suggesting a property interest in this case is found in the Faculty Manual, which all parties concede has contractual force. Aplt. Br., tab A at 9. The first pertinent provision is:

> The conditions and expectations of every appointment shall be
> confirmed in writing. Any subsequent modifications of the

appointment shall also be confirmed in writing after the faculty member and the administrator have mutually determined the new conditions. The faculty member shall receive a copy of these documents.

Aplt. App. 169 (§ E.6.a). Carrying forward the notion that mutual consent will accompany most appointment modifications is the following provision related to tenure:

> Acquisition of tenure carries certain privileges; nevertheless, by mutual agreement between a faculty member and the appropriate administrative officers, the salary and/or employment status of a faculty member may be altered. Any change in salary or employment status of a faculty member which does not rest upon mutual agreement with the administration shall be susceptible to test by appropriate due process procedures as outlined in Section K.

Aplt. App. 175 (§ E.9.6.b). While it is true that procedural protections alone do not create a property interest, see Kingsford v. Salt Lake City Sch. Dist., 247 F.3d 1123, 1129 (10th Cir. 2001); Asbill v. Hous. Auth., 726 F.2d 1499, 1502 (10th Cir. 1984) ( "[P]rocedural protections alone do not create a protected property right in future employment; such a right attaches only when there are substantive restrictions on the employer's discretion."), the provisions of the Faculty Manual go beyond mere procedural protections. The Faculty Manual provides for property interests in tenured appointments to the CSU faculty and also changes in "employment status." Changes to such appointments are given protection by requiring either mutual consent or due process given the provisions limiting the discretion of the Administration.

In Hennigh v. City of Shawnee, 155 F.3d 1249, 1254 (10th Cir. 1998), we concluded that "the same analysis applied to determine the existence of a property right in employment is utilized to determine whether there is a property right in a particular employment status." Here, the substantive restriction on an administrative transfer of tenured faculty is found in the Faculty Manual which provides that a grievant is entitled to relief if the administrative action complained of is "unfair, unreasonable, arbitrary, capricious or discriminatory." See § K.5.6.a ("The Hearing Committee shall not substitute its judgment on the substantive merits of the decision which is the basis for the Grievance but will review the decision of the Responsible Administrator solely to determine whether the action is unfair, unreasonable, arbitrary, capricious or discriminatory."); see also § K.3; K.5.1.c. Even though that same language is used as a standard of review in other parts of the Faculty Manual (see § K.5.8.1 & § K.5.8.2.b), it confers substantive rights, i.e., administrators cannot take action that is unfair, unreasonable, arbitrary, capricious, or discriminatory. A similar standard is used in connection with the discipline of tenured faculty in § E.9.7. Indeed, this standard was applied by the Grievance Hearing Committee in finding for Dr. Hulen. Aplt. App. 85. We also note that administrators' actions are "susceptible to test by appropriate due process procedures," § E.9.6.b, suggesting that those actions may pass or fail such a test based upon the standard employed. If an

- 23 -

administrator can demonstrate adequate cause, then the action will not be deemed "unfair, unreasonable, arbitrary, capricious, or discriminatory."

Defendants argue that several provisions of the Faculty Manual, by not specifically addressing college or departmental assignment, imply that college or departmental assignment is not part of an appointment to which the above provisions apply. They argue that such assignment is not one of the five types of basic appointment in the manual: (1) regular full-time, (2) regular part-time, (3) special, (4) transitional, and (5) temporary. Aplt. App. 164-66. This is not surprising given that the basic appointment concerns such matters as whether an appointee is eligible to acquire tenure, whether the appointment has a specified ending date, and retirement program enrollment. That departmental affiliation can be an incident of the basic appointment is confirmed by the fact that individual academic departments select academic staff and the "joint appointment" provisions which provide that a faculty member "with an *interdepartmental appointment* shall be considered a member of the department contracting for the greater percentage of the time." Aplt. App. 167 (§ E.5.1) (emphasis supplied), at 152 (§ C.2.4.2), 163 (§ E.3.2) (selection of academic faculty).

Defendants also rely upon the definition of tenure in the Faculty Manual to suggest that professors are not appointed to a specific department:

- 24 -

> Tenure is the practice of permanent or continuous appointments for academic faculty in higher education, during which their service at a particular institution may be terminated only for (i) adequate cause demonstrated in a hearing before an appropriately selected faculty committee, (ii) under the extraordinary circumstances of a bona fide financial exigency, involving retrenchment or discontinuance of an academic program or a department of instruction, or (iii) discontinuance of a degree granting program or a department of instruction not mandated by financial exigency.

Aplt. App. 171 (§ E.9.1). They point out that tenure refers to "service at a particular institution," and argue that the use of the disjunctive "or" means that a tenured professor could be assigned to one department, but teach in another, yet still lose tenure if the assigned department was eliminated. Aplt. Br. at 12-13. That may be, but the language (as well as the joint appointment provisions) plainly contemplates program or departmental assignment. The tenure definition makes it clear that the tenure right is not absolute–it may not survive the demise of a program or department due to financial exigency. If anything, the tenure definition has a focus on a program or department, strongly implying that tenured professors are assigned to programs or departments as part of their employment status.

> We have relied upon the following common understanding of tenure:

> The term "tenure" bears common reference to the teaching employment status generally granted after a probationary period which serves to protect a teacher from dismissal except for serious misconduct or incompetence. Drans v. Providence College, [119 R.I. 845] 383 A.2d 1033, 1039 (R.I. 1978) (and authorities therein cited) (footnote omitted). The primary function served by the grant of

- 25 -

tenure is the preservation of academic freedom effected through the provision of job security. Scholars are thereby encouraged to vigorously pursue and disseminate research without fear of reprisal or rebuke from those who support conventional wisdom. Id. See also Annot. 66 A.L.R.3d 1018, et seq.

Crozier v. Howard, 11 F.3d 967, 970 (10th Cir. 1993) (quoting McAloon v. Bryant College of Bus. Admin., 520 F. Supp. 103, 105-06 (D.N.H. 1981)). This is entirely consistent with the above definition by CSU. The laudable aim of tenure is furthered by CSU's provisions requiring mutual consent or due process before a professor is switched out of the academic department reflecting his or her academic discipline.

Defendants also argue that "employment status" as used in § E.9.6.b does not encompass departmental assignment because status only refers to whether the employee is tenure, tenure track, possessing contract rights of renewal, or at will. Aplt. Br. at 13-14 (citing K.2.2.b). We are not persuaded that the provision relied upon, which sets out who may grieve and provides for pre-deprivation due process before a constitutional right is taken away, was ever meant to be a definitional section.

Defendants suggest that even if the transfer affected Dr. Hulen's salary or employment status, university administrators could alter this either by mutual agreement or unilaterally given their inherent powers. We disagree. By way of background, in August 1997 when Dean Costello involuntarily transferred Dr.

Hulen, the State Agricultural Board had delegated part of its personnel powers to the President of CSU. See Colo. Rev. Stat. § 23-5-117 (1987); Aplt. App. 230-36. Included in that delegation was:

> H. The power, concurrently with and in addition to existing inherent power, to impose disciplinary sanctions upon Personnel for violations of established University policies, including, but not limited to, the power to suspend, demote and reassign.

Aplt. App. 233. This delegation could not be subdelegated. Aplt. App. 234. Dean Costello testified in the grievance proceeding that he never claimed this was a disciplinary matter. Aplt. App. 572. This delegation reinforces our conclusion that Dr. Hulen had a property interest in his assignment in the Accounting Department because the delegation plainly limits the President's discretion to reassign. See Hennigh, 155 F.3d at 1254.

Moreover, President Yates testified on deposition that during his almost eleven-year tenure at CSU, he was unaware that any other tenured professor had ever been transferred involuntarily to another department. Aplt. App. 114; accord id. at 483 ("During my 27 years on the Faculty, five years as the [University Mediation Officer], I am unaware of any previous instance where a faculty member has been transferred to another department, without their mutual consent as required by the Faculty Manual.") (Switzer aff.); id. at 787 (Q. "I want to know if there have been other transfers of other faculty from one department to another in some history of this College, or is this the first this has happened?" A.

- 27 -

(Dean Costello) "[N]ot that I'm aware of.").

We conclude that Dr. Hulen had a property interest in his departmental assignment based upon the terms and conditions of his appointment, the Faculty Manual, particularly sections E.6.a and E.9.6.b. It is confirmed by the State Board of Agriculture's delegation of certain personnel powers to the CSU president and the unanimous custom and practice of the university.

### b. Adequacy of Process Afforded

Defendants argue that Dr. Hulen received all the process he was due, even if he had a property interest in his departmental assignment. After a careful review of the record, we agree. Dr. Hulen received as much process as would have been due had he been fired, and the transfer of an employee certainly requires no more procedural safeguards than a termination. To understand our conclusion, it is important to look closely at the process involved.

### i. Process Involved

By December 1996 Dr. Hulen had learned that he was likely to be transferred out of the Accounting and Taxation Department and into the Management Department as part of an effort to remedy ongoing dysfunction within the Accounting and Taxation Department. Desiring to stay in the Accounting and Taxation Department, he began expressing his concerns over the move in an effort to forestall the transfer.

On December 18, 1996, Dr. Hulen protested his potential transfer in a memorandum he gave to Dean Costello. In the document Dr. Hulen made clear that he "really [did] not want to be in the Management Department," and gave specific reasons why such a transfer would be harmful to him and to the university. Aplt. App. at 242. He asserted that CSU would be harmed because the transfer might negatively influence students taking the CPA exam. He also argued that the administration needed "to keep faculty who teach tax together" because there was a "need for joint decision making and close coordination of many aspects of the tax program," and "splitting tax faculty [would] fragment student focus further and probably [would] lead to reduced student numbers over time." Aplt. App. at 242. As for the effect on him personally, Dr. Hulen contended that the transfer would be harmful in that (1) the Management Department chair was a "close friend and business partner" of Professor Mister, the former Accounting and Taxation Department chair against whom Dr. Hulen had filed charges; (2) the Chair "ha[d] been known to express anger/outrage a number of times that charges were filed against Mister"; (3) the Management Department had factional problems; and (4) Dr. Hulen had "no desire to change fields," and the departmental "change would involve a lengthy start-up and would negate a long investment of time in research and publishing [that Dr. Hulen had made] in the tax field." Aplt. App. at 242.

Dr. Hulen wrote Dean Costello again on February 10, 1997, requesting that he be allowed to stay in the Accounting and Taxation Department. This letter gave three pages of detailed reasons why the transfer should not be effectuated. Among other things, Dr. Hulen argued that (1) most of the problems in the Accounting and Taxation Department no longer existed; (2) he did not personally create any of the problems that had existed in the Accounting and Taxation Department; (3) he is an accountant, with public accounting experience, who teaches only tax classes, and he therefore belongs in the Accounting and Taxation Department; (4) being transferred outside the Accounting and Taxation Department would make it "virtually impossible" for him to obtain a job teaching tax or accounting at another institution; (5) being housed in the Management Department would "virtually . . . eliminate any possibility of obtaining outside grants for tax or accounting research"; (6) his professional credibility would be harmed by a transfer to the Management Department; and (7) transferring him to the Management Department would create the impression that he had done something wrong. Aplt. App. at 244-46.

Also on February 10, 1997, four members of the Accounting and Taxation Department, including Dr. Hulen, sent Dean Costello a letter opposing the departmental reassignments and giving reasons why tranquility could be achieved within the Accounting and Taxation Department without the transfers. The letter

admitted that disruption had existed in the past but asserted that the department could now function efficiently. The faculty members urged Dean Costello to undertake an investigation prior to effectuating the departmental transfers. They contended that such an investigation would reveal that the majority of the faculty members do work together and could function under the new department chair, that the faculty members whose transfer was proposed were those most responsible for mentoring younger faculty members, and that departmental transfers would jeopardize the department's ability to achieve new "outreach" requirements. Aplt. App. at 243.

In addition to this written correspondence, Dean Costello and Dr. Hulen met twice—once in February and once in April—to discuss the impending transfer.

Finally, on June 10, 1997, Dr. Hulen's lawyer sent CSU President Yates a letter, with a copy to Dean Costello. The letter notes that "Dean Costello has announced that four of the five faculty members threatened by Dr. Moore, including Dr. Hulen, were being transferred out of the Accounting and Taxation Department . . . ." It then goes on to state that transferring Dr. Hulen to the Management Department would "result in significant professional damages," including (1) decreasing Dr. Hulen's ability to obtain tax and accounting research grants, (2) making it more difficult for him to publish papers, (3) causing

professional stigmatization, and (4) jeopardizing Dr. Hulen's ability to find another job in a tax or accounting department should he ever wish to relocate to another school.

Dr. Hulen's nearly eight months of effort to avoid the transfer proved unsuccessful. On August 5, 1997, he received an official notice letter from Dean Costello, advising him that he would be transferred to the Management Department for the upcoming academic year. The letter stated that he was being transferred as part of an attempt to achieve harmony within the Accounting and Taxation Department.

Despite the official notice, Dr. Hulen was still able to contest his transfer through CSU's grievance process. This process affords extensive procedural protections, including the rights to be represented by counsel, to have an opportunity to be heard, to present all relevant evidence, to confront and cross-examine witnesses, and to have one's case decided by impartial decisionmakers. The grievance process also allows grievants to appeal adverse hearing committee decisions to additional impartial decisionmakers—first to the university provost, then to the university president, and finally to the State Board of Agriculture.

Dr. Hulen twice availed himself of the grievance process, though he waited more than two months—well into the new academic year—before lodging his first complaint. On October 10, 1997, Dr. Hulen filed a grievance claiming that he

was improperly denied due process prior to his transfer. On November 3, 1997, the Grievance Hearing Committee concluded that Dr. Hulen was not entitled to a formal pre-deprivation hearing. Dr. Hulen did not appeal that decision.

In the meantime, on October 20, 1997, Dr. Hulen filed a second grievance, which included an allegation that he was deprived of a property interest in his appointment to the Accounting and Taxation Department without due process of law. On April 3, 1998, the Grievance Hearing Committee conducted a full evidentiary hearing on the second grievance. (The record does not indicate why there was a delay of nearly six months between when Dr. Hulen filed his complaint and his April hearing.) Five days later, the committee issued its decision. Although the committee agreed that Dean Costello had the authority to transfer faculty out of the department and that the Dean had legitimate reasons to do so independent of any motive to retaliate against Dr. Hulen, it concluded that Dean Costello had failed to comply with the mutual-agreement provisions in the Faculty Manual. Accordingly, the committee ruled that Dr. Hulen should be allowed to return to the Accounting and Taxation Department. The decision was appealed to CSU's Provost who, in a May 8, 1998, written decision, reversed the Grievance Hearing Committee and found in favor of Dean Costello on all counts. On June 18, 1998, the President of the University affirmed the Provost's decision, as did the State Board of Agriculture (on a date unspecified in the record).

- 33 -

Aside from the formality of his being assigned to a new department, it is unclear whether Dr. Hulen suffered any adverse consequences between the date of the official notice of his transfer and the date of his evidentiary hearing. In an affidavit Dr. Hulen complains that the departmental reassignment negatively impacted his compensation and his reputation, changed the courses he could teach, and required him to incur additional expenses.

It appears, however, that most, if not all, of these consequences did not occur until after his formal hearing. The August 1997 letter informed him that there would be "few changes, if any," in teaching assignments for the upcoming year. Not until May 1998 (nine months after the notice of transfer and a month after the hearing) was he told that he could teach only two tax classes in the Accounting and Taxation Department in any given year. Similarly, although he claims that he was no longer allowed to teach summer tax or accounting classes, the earliest he could have been deprived of this opportunity was the summer of 1998—nearly a year after he was reassigned to the Management Department. (Moreover, it appears that Dr. Hulen taught the same course during the summer of 1998 that he taught during the summer of 1997—class "BA430." Dr. Hulen aired at least his professional concerns about being removed from the Accounting Department to Dean Costello before he was transferred. Aplt. App. at 279-81.

The timing of other adverse consequences alleged in Dr. Hulen's affidavit

- 34 -

is more difficult to ascertain. Those consequences are all financial. Dr. Hulen claims he would have been *eligible* for an equity adjustment in his salary and for grants available only to accounting department members. He also says that after his transfer he was no longer reimbursed for professional journals, tax association dues, and other professional expenses. His affidavit, however, makes no mention of when these harms occurred. If Dr. Hulen suffered any of these harms before his grievance committee hearing, he has failed to present evidence of that fact. Nor does he explain why he could not have obtained full reimbursement after a post-transfer hearing (had he been successful in his grievance).

### ii. Qualified Immunity

To defeat Dean Costello's claim that he is entitled to qualified immunity on Dr. Hulen's procedural due process claim, Dr. Hulen must show that the procedure afforded him failed to meet constitutional norms that were clearly established in 1997. If anything was clear in 1997 (and it remains so today), it is that the process received by Dr. Hulen was at least as much as the Constitution guarantees. Throughout this litigation there have been repeated references to, and apparent reliance on, the Faculty Manual's procedural rules. But in deciding whether a state has violated a person's constitutional right to procedural due process, we should pay no attention to whether the state has complied with procedures mandated by state law. To be sure, state law determines whether a

person has a property right.  But once the property right is established, it is purely a matter of federal constitutional law whether the procedure afforded was adequate.  As the Supreme Court said in Loudermill, 470 U.S. at 541:  "[O]nce it is determined that the Due Process Clause applies, the question remains what process is due.  The answer to that question is not to be found in the [state] statute."  (internal citation and quotation marks omitted).

This circuit confronted the issue in Hennigh, 155 F.3d at 1256, where a police officer brought a claim that he was denied procedural due process when he was demoted in rank.  He relied in part on the procedures guaranteed by his collective bargaining agreement (CBA).  The court wrote:

> Plaintiff maintains that his procedural due process rights were violated when he was disciplined by Defendants because the discipline was not imposed in accordance with the CBA's requirement that such action could only be taken if it was based on notarized complaints.  However, the Constitution does not require that each individual receive the procedural guarantees provided for by the instrument which bestows a property interest.

Id. (emphasis added); see Levitt v. Univ. of Texas, 759 F.2d 1224, 1229 (5th Cir. 1985) ("Even if the University failed to follow its own rules, it nevertheless gave [the professor] all the process to which he was entitled under the Constitution.").  There is no basis for departing from this precedent.

### iii. Pre-Transfer Process

Dr. Hulen argues that he "did not receive any due process before he was transferred." Aplee. Br. at 21. Such is not the case. As described above, the transfer was not a surprise to Dr. Hulen. The record shows that he knew of the prospect as early as December 1996, eight months before the official letter. In December 1996 and February 1997 he thoroughly explained his position to the dean in writing; and he joined three other faculty members in an additional February 1997 letter. He met with Dean Costello to discuss the matter in February and April 1997. And his lawyer sent a letter to President Yates (with a copy to Dean Costello) in June 1997. The correspondence establishes that there was comprehensive communication between Dr. Hulen and Dean Costello regarding the dean's intentions and Dr. Hulen's reasons for opposing the move.

We reject the suggestion that Dr. Hulen was entitled to a formal hearing—an evidentiary hearing—before being laterally transferred. It would be remarkable if such a hearing were constitutionally required, since the Constitution does not even require such a hearing before an employee is fired.

The leading Supreme Court opinion on the matter is Loudermill. In that case the Court held that constitutional due process required the school board to provide a hearing before terminating tenured school employees; but it fell far short of mandating a formal evidentiary hearing. The Court wrote:

> The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. . . . The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. See Arnett v. Kennedy, 416 U.S. 134, 170-71 (1974) (opinion of Powell, J.) . . . .

470 U.S. at 546. The reference to Justice Powell's concurrence in Arnett is particularly informative, because Justice Powell in that opinion approved a pre-termination procedure that was limited to "30 days' advance written notice of the reasons for his proposed discharge and the materials on which the notice is based[; . . .] the right to respond to the charges both orally and in writing, including the submission of affidavits[; and] . . . an opportunity to appear personally before the official having the authority to make or recommend the final decision." Arnett, 416 U.S. at 170 (Powell, J., concurring). Justice Powell specifically noted that no formal evidentiary hearing would be conducted prior to termination. Id.

Applying Loudermill to claims of denial of pre-termination procedural rights, this circuit has required only the core of notice and an opportunity to be heard. West v. Grand County, 967 F.2d 362, 368 (10th Cir. 1992), observed that "the standards the Supreme Court delineated in Loudermill for pretermination hearings are not very stringent . . . ." In West the plaintiff lost her job because of

an alleged reduction in force by the new county attorney. She had a two-hour discussion with the county attorney during which he informed her that her job was in jeopardy and she asked about her rights under the county personnel rules. She later consulted with county commissioners on the matter. Her claim that she was denied pre-termination due process was rejected. The court relied on two prior Tenth Circuit decisions. It described one as holding that "pretermination warnings and an opportunity for a face-to-face meeting with supervisors" satisfied due process requirements. *Id.* at 367 (citing <u>Seibert v. Univ. of Okla. Health Sci. Ctr.</u>, 867 F.2d 591, 596-99 (10th Cir. 1989), abrogated on other grounds, <u>Federal Lands Legal Consortium v. United States</u>, 195 F.3d 1190, 1195 (10th Cir. 1999)). It described the other as holding that "[a] brief face-to-face meeting with a supervisor provides sufficient notice and opportunity to respond . . . ." <u>Id</u>. at 368 (citing <u>Powell v. Mikulecky</u>, 891 F.2d 1454, 1459 (10th Cir. 1989)).

Thus, Dr. Hulen actually received more pre-deprivation process than what these cases held to be constitutionally sufficient in the job-termination context. He was able to meet with the decisionmaker twice, lodged repeated written complaints, and engaged the services of an attorney in an attempt to avoid the transfer. Given the benchmarks established by <u>Loudermill</u> and the Tenth Circuit cases that followed, it is apparent that Dr. Hulen received all the pre-transfer process he was due.

- 39 -

iv.  Post-transfer process

Our discussion of the adequacy of the post-transfer process can be brief.

CSU provides an extensive grievance process.  Dr. Hulen (1) had a hearing, (2)

was assisted by counsel, (3) cross-examined opposition witnesses, (4) called his

own witnesses, (5) presented his side of the story, (6) had his case decided by

impartial decisionmakers, and (7) had three levels of appellate review, each

performed by an impartial decisionmaker.  Aplt. App. at 201-03.

Dr. Hulen's only complaint regarding this process is that he improperly bore

the burden of proof.  He argues that this was improper because his grievance

should have been categorized as "Class A" (rather than "Class B") under the

Faculty Manual, thereby placing the burden on the CSU administration.  Although

accepted by the district court, this argument has no merit.  As stated above, the

Faculty Manual's allocation of the burden is irrelevant to the constitutional

question.  See Loudermill, 470 U.S. at 541.

As for the constitutional question, "[o]utside the criminal law area, where

special concerns attend, the locus of the burden of persuasion is normally not an

issue of federal constitutional moment."  Lavine v. Milne, 424 U.S. 577, 585

(1976).  Dr. Hulen relies, however, on a statement in this court's decision in

Benavidez v. City of Albuquerque, 101 F.3d 620 (10th Cir. 1996).  Although

rejecting the procedural due process claim by the terminated employee in that case,

the opinion left open the possibility that it may be improper to place the burden of proof on the employee when the employee has been offered "little or no opportunity . . . to present his side of the case" in the pre-termination process. 101 F.3d at 626. But that is not the situation here. Dr. Hulen had full notice of the proposed transfer and repeated opportunities to respond. He likely knew as much about the university's position on the matter as if he had been given a full-scale evidentiary hearing before his transfer. Thus, Benavidez undermines, rather than supports, Dr. Hulen's position.

Having determined that the Defendants' conduct did not violate Dr. Hulen's right to due process, we need not address the argument that any such right was not clearly established at the time of the conduct.

We AFFIRM the denial of qualified immunity on the First Amendment claim, REVERSE the grant of summary judgment in favor of Dr. Hulen on his procedural due process claim, and GRANT qualified immunity to Dean Costello on the procedural due process claim.