**F I L E D**

PUBLISH

**January 11, 2006**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

DANNY V. MALDONADO; RUBEN
D. RIOS; DANNY ALCORTA;
HENRY O'FLORIAN MARTINEZ;
TOMMY R. SANCHEZ; LLOYD
LOPEZ; CARLOS RAMIREZ;
ADRIAN B. ALONZO; LINDA
MUTCHLER; FRANK
MALDONADO; FREDDIE PEREZ,

      Plaintiffs - Appellants,

    v.

CITY OF ALTUS, OKLAHOMA, a
municipal corporation; MICHAEL
NETTLES, Administrator, in his
individual and official capacities;
HOLMES WILLIS, Street
Commissioner, in his individual and
official capacities,

      Defendants - Appellees,

AMERICAN CIVIL LIBERTIES
UNION OF OKLAHOMA
FOUNDATION; EQUAL
EMPLOYMENT OPPORTUNITY
COMMISSION,

      Amici-Curie.

No. 04-6062

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 03-CV-336-R)

Mark E. Hammons (Tamara L. Gowens, with him on the brief) of Hammons & Associates, Oklahoma City, Oklahoma, for Plaintiffs - Appellants.

Margaret McMorrow-Love, Oklahoma City, Oklahoma (David W. Kirk of Lytle, Soule & Curlee, Oklahoma City, Oklahoma, with her on the brief), for Defendants - Appellees, City of Altus, Oklahoma, and Michael Nettles.

Ambre Camille Gooch (David W. Lee with her on the brief), of Comingdeer, Lee & Gooch, Oklahoma City, Oklahoma, for Defendant - Appellee, Holmes Willis.

Tina L. Izadi, American Civil Liberties Union of Oklahoma Foundation, Oklahoma City, Oklahoma; Anne Noel Occhialinio (Eric S. Dreiband, General Counsel; Vincent J. Blackwood, Acting Associate General Counsel; Carolyn L. Wheeler, Assistant General Counsel, with her on the brief), Equal Employment Opportunity Commission, Washington, D.C., for Amici Curiae.

Before **SEYMOUR** and **HARTZ**, Circuit Judges, and **BRACK**, District Judge.[*]

**HARTZ**, Circuit Judge.

Plaintiffs are employees of the City of Altus, Oklahoma (City).  They appeal the district court's grant of summary judgment dismissing all their claims against the City, the City Administrator, and the Street Commissioner (collectively referred to as Defendants).  All claims arise out of the City's English-only policy for its employees.  Asserting claims of both disparate-impact

---

[*] The Honorable Robert C. Brack, United States District Judge for the District of New Mexico, sitting by designation.

and disparate-treatment, Plaintiffs contend that the English-only policy discriminates against them on the basis of race and national origin in violation of Titles VI and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–2000e. They also claim intentional discrimination under the Civil Rights Act of 1866, 42 U.S.C. § 1981. Finally, Plaintiffs bring claims under the Civil Rights Act of 1871, 42 U.S.C. § 1983, arguing that the policy deprives them of equal protection and freedom of speech. The Equal Employment Opportunity Commission (EEOC) and the American Civil Liberties Union of Oklahoma Foundation each filed amicus briefs in support of Plaintiffs. We have jurisdiction under 28 U.S.C. § 1291. We reverse and remand with respect to Plaintiffs' claims against the City alleging disparate impact and disparate treatment under Title VII; intentional discrimination under § 1981; and violation of equal protection under 42 U.S.C. § 1983. We affirm summary judgment for Defendants on all other claims.

## I.    BACKGROUND

### A.    Factual Background

Plaintiffs' claims stem from the City's promulgation of an English-only policy. Approximately 29 City employees are Hispanic, the only significant national-origin minority group affected by the policy. All Plaintiffs are Hispanic and bilingual, each speaking fluent English and Spanish.

In the spring of 2002 the City's Street Commissioner, Defendant Holmes Willis, received a complaint that because Street Department employees were speaking Spanish, other employees could not understand what was being said on the City radio. Willis informed the City's Human Resources Director, Candy Richardson, of the complaint, and she advised Willis that he could direct his employees to speak only English when using the radio for City business.

Plaintiffs claim that Willis instead told the Street Department employees that they could not speak Spanish at work at all and informed them that the City would soon implement an official English-only policy. On June 18, 2002, Plaintiff Tommy Sanchez wrote a letter to Ms. Richardson and the City Administrator, Defendant Michael Nettles, expressing concerns about the new Street Department English-only policy and the proposed citywide policy. Sanchez was particularly concerned that his subordinates, Plaintiffs Ruben Rios and Lloyd Lopez, had been told of a policy that he knew nothing about. Citing the City's Personnel Policies and Procedures Manual, the letter informed Nettles that employees had not been given proper notice if this was a new administrative policy and questioned whether Willis and the City had followed proper procedures in implementing the new policy. Sanchez reported that Willis had told him that the reason Hispanics speak Spanish "is because [of] . . . insecurities," Ex. H, R. Vol. II at 521, and that Willis had suggested that he (Sanchez) "would feel

-4-

uncomfortable if another race wromuld speak their native language in front of [him]," *id.* The letter requested that "the City of Altus understand that we Hispanics are proud of our heritage and do not feel that our ability to communicate in a bilingual manner is a hindrance or an embarrassment. There has never been a time that because I spoke Spanish to another Spanish speaking individual, I was unable to perform our job duties and requirements." *Id.* at 523. At the end of the letter Rios and Lopez signed a paragraph stating that "[t]he purpose of this correspondence is to serve as a discrimination complaint in accordance with the City of Altus Personnel Policies and Procedures Manual Section 102, in which we are requesting that an investigation be conducted into these charges and that a report be issue[d] within two weeks." *Id.* Another employee (Leticia Sanchez) also complained orally to Richardson about Willis's instructing employees not to speak Spanish in any circumstances during work hours.

In July 2002 the City promulgated the following official policy signed by Nettles:

> To insure effective communications among and between employees
> and various departments of the City, to prevent misunderstandings
> and to promote and enhance safe work practices, *all work related and*
> *business communications during the work day shall be conducted in*
> *the English language with the exception of those circumstances*
> *where it is necessary or prudent to communicate with a citizen,*
> business owner, organization or criminal suspect *in his or her native*
> *language due to the person or entity's limited English language*

*skills.* The use of the English language during work hours and while engaged in City business includes face to face communication of work orders and directions as well as communications utilizing telephones, mobile telephones, cellular telephones, radios, computer or e-mail transmissions and all written forms of communications. *If an employee or applicant for employment believes that he or she cannot understand communications due to limited English language skills, the employee is to discuss the situation with the department head* and the Human Resources Director to determine what accommodation is required and feasible. *This policy does not apply to strictly private communications between co-workers while they are on approved lunch hours or breaks or before or after work hours* while the employees are still on City property *if City property is not being used for the communication.* Further, *this policy does not apply to strictly private communication between an employee and a family member* so long as the communications are limited in time and are not disruptive to the work environment. Employees are encouraged to be sensitive to the feelings of their fellow employees, including a possible feeling of exclusion if a co-worker cannot understand what is being said in his or her presence when a language other than English is being utilized.

Pls.' Ex. L., R. Vol. II at 560-61 (emphasis added).

Defendants state three primary reasons for adopting the policy:

1) workers and supervisors could not understand what was being said over the City's radios . . . ; 2) non-Spanish speaking employees, both before and after the adoption of the Policy, informed management that they felt uncomfortable when their co-workers were speaking in front of them in a language they could not understand because they did not know if their co-workers were speaking about them; and 3) there were safety concerns with a non-common language being used around heavy equipment.

City/Nettles Br. at 42. Although the district court observed "that there was no written record of any communication problems, morale problems or safety problems resulting from the use of languages other than English prior to

-6-

implementation of the policy," Dist. Ct. Order at 6, R. Vol. III at 875, it noted that Willis had testified that at least one employee complained about the use of Spanish by his co-workers before implementation of the policy and other non-Spanish speaking employees subsequently made similar complaints. Those city officials who were deposed could recount no incidents of safety problems caused by the use of a language other than English, but the district court found that some Plaintiffs were aware "that employee safety was one reason for the adoption of the policy." *Id.* at 7. The court also stated that "it does not seem necessary that the City await an accident before acting." *Id.* at 18 n.20.

Defendants offered evidence that the restrictions in the written policy were actually relaxed to allow workers to speak Spanish during work hours and on City property if everyone present understood Spanish. But Plaintiffs offered evidence that employees were told that the restrictions went beyond the written policy and prohibited all use of Spanish if a non-Spanish speaker was present, even during breaks, lunch hours, and private telephone conversations. Plaintiff Lloyd Lopez stated in his deposition that "we were told that the only time we could speak Spanish is when two of us are in a break room by ourselves, and if anybody other than Hispanic comes in, we are to change our language." R. Vol. II at 631. In addition he said, "We no longer can speak about anything in general in Spanish around anybody. Even if we were on the phone talking to our wives and we were

having a private conversation with them and somebody happened to walk by, we were to change our language because it would offend whoever was walking by." *Id.* Lopez understood, however, that the policy permitted him to speak Spanish if he was alone in a truck with another Spanish-speaking co-worker. Plaintiff Ruben Rios testified in his deposition that he similarly understood the policy to exclude the use of Spanish during breaks and the lunch hour if non-Hispanic co-workers were present. When asked specifically whether he understood that the policy allowed Spanish to be spoken between co-workers during lunch or other breaks, he stated that "[a]s long as there was another Hispanic person, we could speak in Spanish but away from other individuals, non-Hispanic people." R. Vol. III at 805-06. And Plaintiff Tommy Sanchez testified that he was told that he could not speak Spanish at all, but added that Richardson explained to him that "[t]hat's not the way [the City] meant it." R. Vol. I at 127. The City has not disciplined anyone for violating the English-only policy.

Plaintiffs allege that the policy created a hostile environment for Hispanic employees, causing them "fear and uncertainty in their employment," R. Vol. II at 456-57, and subjecting them to racial and ethnic taunting. They contend "that the English-only rule created a hostile environment because it pervasively–every hour of every work day–burdened, threatened and demeaned the [Plaintiffs] because of their Hispanic origin." Aplt. Opening Br. at 47. Plaintiffs each stated in their

affidavits:

> The English-only policy affects my work environment every day. It reminds me every day that I am second-class and subject to rules for my employment that the Anglo employees are not subject to. I feel that this rule is hanging over my head and can be used against me at any point when the City wants to have something to write me [up] for.

R. Vol. II at 668-75, 677.

Evidence of ethnic taunting included Plaintiffs' affidavits stating that they had "personally been teased and made the subject of jokes directly because of the English-only policy[,]" and that they were "aware of other Hispanic co-workers being teased and made the subject of jokes because of the English-only policy." *Id.* Plaintiff Tommy Sanchez testified in his deposition that each time he went to the City of Altus he was reminded of the restrictions on his speech by non-Hispanic employees. He stated that these other employees of the City of Altus "would pull up and laugh, start saying stuff in Spanish to us and said, 'They didn't tell us we couldn't stop. They just told you.'" *Id.* at 660. Sanchez also testified that an Altus police officer taunted him about not being allowed to speak Spanish by saying, "'Don't let me hear you talk Spanish.'" *Id.* He further testified that "some of the guys from the street department would . . . poke fun out of it [the policy]" *id.*, and that when he went to other departments "they would bring it up constantly," *id.* As evidence that such taunting was not unexpected by management, Lloyd Lopez recounted in his deposition that Street Commissioner

-9-

Willis told Ruben Rios and him that he was informing them of the English-only policy in private because Willis had concerns about "the other guys making fun of [them]." R. Vol. II at 627. Plaintiffs also provided evidence that Mayor Gramling was "quoted in a newspaper article as referring to the Spanish language as 'garbage,'" *id.* at 621, although the Mayor claims that he used the word *garble* and was misquoted.

### B. EEOC Proceedings

Each Plaintiff filed a discrimination charge with the EEOC, complaining that the English-only policy constituted national-origin discrimination. Plaintiffs Danny Maldonado and Tommy Sanchez also alleged retaliation in their charges, and Danny Maldonado and Freddie Perez claimed that they had been subjected to "harassment and intimidation resulting in a hostile work environment." R. Vol. II at 365, 367.

After an investigation the EEOC determined that the City "ha[d] committed a per se violation of [Title VII] with respect to the establishment of its overly broad and discriminatory English-only policy." R. Vol. II at 563, 567, 569, 572, 575. The EEOC attempted to resolve the dispute informally, but these efforts were unsuccessful. Each Plaintiff received a right-to-sue letter and this litigation commenced. Defendants do not claim that Plaintiffs failed to exhaust administrative remedies.

## C.    Court Proceedings

In district court Plaintiffs brought (1) disparate-treatment, disparate-impact, and retaliation claims under Title VII, raising a hostile-work-environment theory as part of their disparate-treatment and disparate-impact claims; (2) disparate-treatment and disparate-impact claims under Title VI; (3) equal-protection and First Amendment claims under 42 U.S.C. § 1983; and (4) intentional discrimination claims under 42 U.S.C. § 1981.  The district court granted summary judgment in favor of Defendants on all claims.

## II.    DISCUSSION

"We review de novo a district court's grant or denial of summary judgment, and we apply the same legal standard [to be] employed by the district court [under] Federal Rule of Civil Procedure 56(c)."  *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1096 (10th Cir. 1999).  "If . . . review of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' reveals 'there is no genuine issue as to any material fact[,] . . . the moving party is entitled to summary judgment as a matter of law.'"  *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 921 (10th Cir. 2001) (quoting Fed. R. Civ. P. 56(c)).  "In reviewing such dispositions, this court repeatedly has emphasized that we must draw all inferences in favor of the party opposing summary judgment[,] [and] [i]n this respect, we must view the evidence in context, not

-11-

simply in its segmented parts. " *O'Shea,* 185 F.3d at 1096 (internal citations omitted).

### A.    Title VI

Plaintiffs claim that as a recipient of federal funding, the City has violated Title VI by adopting the English-only policy.  Title VI is a general prohibition against discrimination by federally funded programs.[1]  When the discrimination relates to employment, Title VI could substantially duplicate Title VII.  But 42 U.S.C. § 2000d-3 significantly limits the application of Title VI in the employment context.  It states:  "Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment."  We have held that these limitations apply "to the implied private rights of action which have been read into the statute." *Reynolds v. Sch. Dist. No.1, Denver, Colo.*, 69 F.3d 1523, 1531 n.8 (10th Cir. 1995).  Thus, "covered entities can only be sued for employment discrimination

---

[1]Title VI states:
"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

42 U.S.C. § 2000d.

[under Title VI] where a primary objective of the Federal financial assistance to that program or activity is to provide employment." *Id.* at 1531 (internal quotation marks and brackets omitted).

Accordingly, for Plaintiffs to "sustain [their] Title VI claim[, they] must show that Defendants received federal funds for a primary objective of providing for employment." *Id.* Although Street Commissioner Willis alerted Plaintiffs to the *Reynolds* requirement in his summary-judgment brief and the City's summary-judgment brief also noted that the amended Complaint had not alleged a proper Title VI predicate, Plaintiffs never alleged, let alone provided evidence, that any federal funds received by the City have had a primary objective of providing employment. Nor have Plaintiffs alleged or demonstrated that any of their salaries have been paid, in whole or in part, with federal funds. Although on appeal Defendants rely on different arguments with respect to the Title VI claims, "we have discretion to affirm on any ground adequately supported by the record[,]" *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004), so long as the parties have had a fair opportunity to address that ground. We therefore affirm the dismissal of all Plaintiffs' Title VI claims for failure to plead or prove that the federal funding received by the City had a primary objective of providing pertinent employment.

## B.    Disparate-Impact Claims

-13-

Plaintiffs remaining disparate-impact claims arise under Title VII. Title VII defines unlawful employment practices as follows:

(a) Employer practices

It shall be an unlawful employment practice for an employer–

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). One might say that Plaintiffs have not been subjected to an unlawful employment practice because they are treated identically to non-Hispanics. They claim no discrimination with respect to their pay or benefits, their hours of work, or their job duties. And every employee, not just Hispanics, must abide by the English-only policy. But the Supreme Court has "repeatedly made clear that although Title VII mentions specific employment decisions with immediate consequences, the scope of the prohibition is not limited to economic or tangible discrimination, and that it covers more than terms and conditions in the narrow contractual sense." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002) (internal brackets, quotation marks, and citation omitted).

The conditions of work encompass the workplace atmosphere as well as the more tangible elements of the job. Title VII does not tolerate, for example, a racist or sexist work environment "that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted). In their disparate-impact claim Plaintiffs allege that the City's English-only policy has created such an environment for Hispanic workers. Discrimination against Hispanics can be characterized as being based on either race or national origin. *See Alonzo v. Chase Manhattan Bank, N.A.*, 25 F. Supp.2d 455, 460 (S.D.N.Y. 1998).

To prevail on these claims, Plaintiffs need not show that the policy was created with discriminatory intent. In the leading case on the subject, *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971), the Supreme Court held that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." These kinds of claims, known as disparate-impact claims, "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36 n.15 (1977). Thus, "[a] disparate-impact claim . . . does not require a showing of discriminatory intent." *Bullington v.*

-15-

*United Air Lines, Inc.*, 186 F.3d 1301, 1312 (10th Cir. 1999), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 n.11 (2002). To be sure, claims based on a hostile work environment commonly are disparate-treatment claims, which do require proof of discriminatory intent. Indeed, Plaintiffs here bring such a disparate-treatment claim as well as this discriminatory-impact claim. But there is no reason to prohibit discriminatory-impact claims predicated on a hostile work environment. *See generally* L. Camille Hébert, *The Disparate Impact of Sexual Harassment: Does Motive Matter?*, 53 U. Kan. L. Rev. 341 (2005). (It is worth noting, however, that compensatory and punitive damages are not available under a disparate-impact claim. *See* 42 U.S.C. § 1981a(a)(i).)

The allocation of the burdens of proof in disparate-impact cases is set forth in 42 U.S.C. § 2000e-2(k), enacted in 1991 after the Supreme Court's opinion in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), imposed a heavier burden on plaintiffs. Under the statute a plaintiff first must "demonstrate[] that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). "This *prima facie* case, in many respects, is more rigorous than in a disparate treatment case because a plaintiff must not merely show circumstances raising an inference of discriminatory impact but must demonstrate the

-16-

discriminatory impact at issue." *Bullington*, 186 F.3d at 1312. If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(I).

### 1. Prima-facie case

The district court, relying principally on *Garcia v. Spun Steak Co.*, 998 F.2d 1480 (9th Cir. 1993), concluded that Plaintiffs had "not shown that requiring them to use the English language in the workplace imposed significant, adverse effects on the terms, conditions or privileges of their employment, so as to create a prima facie case of disparate impact discrimination under Title VII." Dist. Ct. Order at 15. Even under *Spun Steak*, however, English-only policies are not always permissible; each case turns on its facts. 998 F.2d at 1489. Here, Plaintiffs have produced evidence that the English-only policy created a hostile atmosphere for Hispanics in their workplace. As previously set forth, all the Plaintiffs stated that they had experienced ethnic taunting as a result of the policy and that the policy made them feel like second-class citizens. Tommy Sanchez testified to instances of taunting by an Altus Police officer, Street Department employees, and other non-Hispanic employees of the City. As evidence that such harassment would be an expected consequence of the policy, Lloyd Lopez

testified that Street Commissioner Willis told him that he was notifying him of the policy in private because of concern that other employees would tease Hispanic employees about the policy if they learned of it.

Some of this evidence, as the district court pointed out, has diluted persuasive power because of the absence of specifics—who made what comment when and where. In a typical hostile-work-environment case, we might conclude that the evidence of co-worker taunting did not reach the threshold necessary for a Title VII claim.

There are, however, other considerations with respect to a *policy* that allegedly creates a hostile work environment. The policy itself, and not just the effect of the policy in evoking hostility by co-workers, may create or contribute to the hostility of the work environment. A policy requiring each employee to wear a badge noting his or her religion, for example, might well engender extreme discomfort in a reasonable employee who belongs to a minority religion, even if no co-worker utters a word on the matter. Here, the very fact that the City would forbid Hispanics from using their preferred language could reasonably be construed as an expression of hostility to Hispanics. At least that could be a reasonable inference if there was no apparent legitimate purpose for the restrictions. It would be unreasonable to take offense at a requirement that all pilots flying into an airport speak English in communications with the tower or

between planes; but hostility would be a reasonable inference to draw from a requirement that an employee calling home during a work break speak only in English. The less the apparent justification for mandating English, the more reasonable it is to infer hostility toward employees whose ethnic group or nationality favors another language. For example, Plaintiffs presented evidence that the English-only policy extended beyond its written terms to include lunch hours, breaks, and even private telephone conversations, if non-Spanish-speaking co-workers were nearby. Absent a legitimate reason for such a restriction, the inference of hostility may be reasonable.

Our task in this appeal is not to determine whether Plaintiffs have established that they were subjected to a hostile work environment. Rather, in reviewing the grant of summary judgment to Defendants, we are to decide only whether a rational juror could find on this record that the impact of the English-only policy on Hispanic workers was "sufficiently severe or persuasive to alter the conditions of [their] employment and create an abusive working environment." *Harris*, 510 U.S. at 21.

It is in this context that we consider the EEOC guideline on English-only workplace rules, 29 C.F.R. § 1606.7. Under the relevant provisions of the guideline: (1) an English-only rule that applies at all times is considered "a burdensome term and condition of employment," § 1606.7(a), presumptively

constituting a Title VII violation; and (2) an English-only rule that applies only at certain times does not violate Title VII if the employer can justify the rule by showing business necessity, § 1606.7(b). The EEOC rationales for the guideline are: (1) English-only policies "may 'create an atmosphere of inferiority, isolation, and intimidation' that could make a 'discriminatory working environment,'" EEOC Br. at 13 (quoting § 1606.7(a)); (2) "English-only rules adversely impact employees with limited or no English skills . . . by denying them a privilege enjoyed by native English speakers: the opportunity to speak at work," *id.* at 14; (3) "English-only rules create barriers to employment for employees with limited or no English skills," *id.*; (4) "English-only rules prevent bilingual employees whose first language is not English from speaking in their most effective language," *id.* at 15; and (5) "the risk of discipline and termination for violating English-only rules falls disproportionately on bilingual employees as well as persons with limited English skills," *id.* at 16.

EEOC guidelines, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank, F.S.B. v. Vinson*, 477 U.S. 57, 65 (1986) (internal quotation marks omitted). In *Spun Steak* the Ninth Circuit rejected the English-only guideline outright because, in its view, nothing in the plain text or the legislative history of Title VII supported the

guideline's presumption of a disparate impact. *See* 998 F.2d at 1489-90. But we need not resolve the validity of that presumption. For our purposes, it is enough that the EEOC, based on its expertise and experience, has consistently concluded that an English-only policy, at least when no business need for the policy is shown, is likely in itself to "create an atmosphere of inferiority, isolation, and intimidation" that constitutes a "discriminatory working environment." § 1606.7(a). (We recognize that several of the EEOC's other grounds for its guideline do not apply here. For example, there is no evidence that the policy prevented any of the Plaintiffs from speaking at work, because all are bilingual.) We believe that these conclusions are entitled to respect, not as interpretations of the governing law, but as an indication of what a reasonable, informed person may think about the impact of an English-only work rule on minority employees, even if we might not draw the same inference. Assuming the reasonableness of the EEOC on the matter, we cannot say that on the record before us it would be unreasonable for a juror to agree that the City's English-only policy created a hostile work environment for its Hispanic employees. We are not suggesting that the guideline is evidence admissible at trial or should be incorporated in a jury instruction. What we are saying is only that a juror presented with the evidence presently on the record in this case would not be unreasonable in finding that a hostile work environment existed.

## 2.  Business Necessity

As an alternative ground for granting summary judgment on the disparate-impact claim, the district court held that Defendants "offered sufficient proof of business justification." Dist. Ct. Order at 17. It found "that city officials had received complaints that some employees could not understand what was being said on the City's radio frequency because other employees were speaking Spanish . . . [and] that city officials received complaints from non-Spanish speaking employees who felt uncomfortable when their co-workers spoke Spanish in front of them." R. Vol. III at 886-87. Based on these justifications, it concluded that "Defendants have met any burden they may have to demonstrate that the City's English-only policy was supported by an adequate business justification." *Id.* at 887.

We disagree. One of Congress's stated purposes in passing the 1991 amendments to the Civil Rights Act was "to codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), and in the other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989)." Civil Rights Act of 1991, Pub. L. No. 102-166, Sec. 3, 105 Stat. 1071 (1991). In *Griggs* the Supreme Court held that "Congress has placed on the employer the burden of showing that any given requirement must have a manifest relationship to the employment in

question." 401 U.S. at 432. The Court stressed that "[t]he touchstone is business necessity. If an employment practice which operates to [discriminate against a protected minority] cannot be shown to be related to job performance, the practice is prohibited." *Id.* at 431.

Defendants' evidence of business necessity in this case is scant. As observed by the district court, "[T]here was no written record of any communication problems, morale problems or safety problems resulting from the use of languages other than English prior to implementation of the policy." Dist. Ct. Order at 6. And there was little undocumented evidence. Defendants cited only one example of an employee's complaining about the use of Spanish prior to implementation of the policy. Mr. Willis admitted that he had no knowledge of City business being disrupted or delayed because Spanish was used on the radio. In addition, "city officials who were deposed could give no specific examples of safety problems resulting from the use of languages other than English. . . ." *Id.* at 7. Moreover, Plaintiffs produced evidence that the policy encompassed lunch hours, breaks, and private phone conversations; and Defendants conceded that there would be no business reason for such a restriction.

On this record we are not able to affirm summary judgment based on a business necessity for the English-only policy. A reasonable person could find

-23-

from this evidence that Defendants had failed to establish a business necessity for the English-only rule.

## C.      Disparate-Treatment

### 1.        Discrimination

Plaintiffs allege that the City engaged in intentional discrimination in violation of several statutes:  Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983.[2] As previously noted, Title VII bars discrimination in employment on the basis of race or national origin.  Section 1981 provides equal rights to make and enforce contracts and to the benefits of laws for the security of persons and property.[3] Section 1983 prohibits those acting under color of state law from depriving others

---

[2]In *Burns v. Bd. of County Comm'rs*, 330 F.3d 1275, 1288 n.10 (10th Cir. 2003), we recognized a circuit split over whether the 1991 amendments to § 1981 overruled *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989), which held that "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units."  *Burns* did not resolve the issue for this circuit, nor will we. Because we affirm qualified immunity for the individual defendants on the § 1981 and § 1983 claims and because the City did not raise this argument, we do not address this issue.

[3]Section 1981 states:
"All persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . ."

of their federal rights;[4] the right invoked by Plaintiffs is the right to equal protection of the laws under the Fourteenth Amendment.

The same analytical framework is applicable to all Plaintiffs' theories of intentional discrimination. "[I]n [disparate-treatment] discrimination suits, the elements of a plaintiff's case are the same . . . whether that case is brought under §§ 1981 or 1983 or Title VII." *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991). To prevail under a disparate-treatment theory, "a plaintiff must show, through either direct or indirect evidence, that the discrimination complained of was intentional." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000).

Plaintiffs contend that they were intentionally discriminated against by the creation of a hostile work environment. We have already held that there is sufficient evidence to support a finding of a hostile work environment. The issue

---

[4]Section 1983 provides in relevant part:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C.A. § 1983.

remaining, therefore, is whether those who established the English-only policy did so with the intent to create a hostile work environment.

To begin with, the disparate impact of the English-only rule (creation of a hostile work environment) is in itself evidence of intent. As the Supreme Court stated in *International Brotherhood of Teamsters,* 431 U.S. at 335 n.15, in a disparate-treatment case, "Proof of discriminatory motive . . . can in some situations be inferred from the mere fact of differences in treatment." *See Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.").

Here, Plaintiffs can rely on more than just that inference. First, there is evidence that management realized that the English-only policy would likely lead to taunting of Hispanic employees: Street Commissioner Willis allegedly told two Hispanic employees about the policy in private because of concern that non-Hispanic employees would tease them if they learned of it. Also, a jury could find that there were no substantial work-related reasons for the policy (particularly if it believed Plaintiffs' evidence that the policy extended to nonwork periods), suggesting that the true reason was illegitimate. Further, the policy was adopted without prior consultation with Hispanic employees, or even prior disclosure to a consultant to the City who was conducting an investigation

of alleged anti-Hispanic discrimination during the period when the English-only policy was under consideration. Finally, there is evidence that during a news interview the Mayor referred to the Spanish language as "garbage." R. Vol. II at 621.

In our view, the record contains sufficient evidence of intent to create a hostile environment that the summary judgment on those claims must be set aside.

## 2. Retaliation

Plaintiffs also claim that they were retaliated against for engaging in conduct protected under Title VII and 42 U.S.C. § 1981. (To the extent that Plaintiffs raise their retaliation claim under 42 U.S.C. § 1983, asserting violations of equal protection, we have long held that such "a theory of liability for retaliatory conduct [does not] come within § 1983." *Long v. Laramie County Cmty. Coll. Dist.*, 840 F.2d 743, 752 (10th Cir. 1988); *see also Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997) (stating that "[a] pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause," and listing cases).)

We begin by noting that only Plaintiffs Danny Maldonado and Tommy Sanchez alleged retaliation claims in their EEOC charges. With respect to the retaliation claims raised by all other Plaintiffs under Title VII, the courts "lack jurisdiction to review Title VII claims that are not part of a timely-filed EEOC

charge." *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1238 (10th Cir. 2004). We affirm the dismissal of those Title VII claims.

We have said that the elements of a retaliation claim under § 1981 are identical to those required under Title VII. *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1103 n.1 (10th Cir. 1998). Plaintiffs must show that "(1) [they] engaged in protected opposition to discrimination; (2) [they were] subject[ed] to adverse employment action; and (3) . . . there exists a causal connection between the protected activity and the adverse action." *Id.* at 1103.

Plaintiffs claim that their protected conduct was the June 18 letter, written by Sanchez and also signed by Ruben Rios and Lloyd Lopez. We assume that sending the letter was protected conduct for Plaintiffs Sanchez, Rios, and Lopez. But it is too great a stretch to infer that adoption of the English-only policy was retaliation for the letter. After all, the policy had already been imposed in the Street Department, where Sanchez, Rios, and Lopez worked—that is why Sanchez wrote the letter. And the citywide policy was no more stringent than the Street Department policy; if anything, it was more lenient.

Because of the lack of evidence of a causal connection, we agree with the district court that Defendants were entitled to summary judgment on the retaliation claims.

### D. Section 1983 First Amendment Claims

Plaintiffs devote the final four pages of their opening brief to a claim that the City's English-only policy violates their First Amendment rights. It is settled that a government entity "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Wilson v. City of Littleton*, 732 F.2d 765, 767 (10th Cir. 1984); *cf. Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 (1990) ("[P]romotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees."). "At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering*, 391 U.S. at 568. These conflicting values require us "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the [government entity], as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

To determine whether a public employer has infringed the First Amendment free-speech rights of an employee, we apply a four-part test:

> First, the court must decide whether the speech at issue touches on a matter of public concern. *Connick*, 461 U.S. at 146; *Melton [v. City*

-29-

*of Oklahoma City]*, 879 F.2d [706,] 713 [(10th Cir. 1989)]. If it does, the court must balance the interest of the employee in making the statement against the employer's interest 'in promoting the efficiency of the public services it performs through its employees.' *Pickering . . . ,* 391 U.S. [at] 568, . . . . Third, if the preceding prerequisites are met, the speech is protected, and plaintiff must show her expression was a motivating factor in the detrimental employment decision. *Mount Healthy City School Dist. v. Doyle*, 429 U.S. 274, 287 (1977). Finally, if the plaintiff sustains this burden, the employer can still prevail if it shows by a preponderance of the evidence that it would have made the same decision regardless of the protected speech.

*Schalk v. Gallemore*, 906 F.2d 491, 494-95 (10th Cir. 1990). (We shall refer to this test as the *Pickering-Mount Healthy* test.) "In deciding how to classify particular speech, courts focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. "An employee's speech must not merely relate generally to a subject matter that is of public interest, but must sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government." *Moore v. City of Wynnewood*, 57 F.3d 924, 932 (10th Cir. 1995) (internal quotation marks omitted). Ordinarily, for an employee's work-related speech to be on a matter of public concern, the speech

-30-

must be uttered with an eye to action, to improve the public welfare, not just to remedy a personal grievance.

Although Plaintiffs contend that their claim should be analyzed, at least as an alternative, under the First Amendment doctrines governing prior restraints, *see O'Connor v. City & County of Denver*, 894 F.2d 1210, 1220 (10th Cir. 1990), or symbolic speech, *see United States v. O'Brien*, 381 U.S. 367 (1967) (burning draft cards), the proper analysis of prior restraints and symbolic speech in a public-employment context is to be found in the *Pickering* line of cases, *see Wilson v. City of Littleton*, 732 F.2d 765, 767 (10th Cir. 1984) ("In public employee cases, whether they involve actual or symbolic speech, the proper analysis is that established in *Pickering* [and its progeny]."); *see also United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 466-67 & n.11 (1995) (partially invalidating statute prohibiting federal employees from accepting honoraria for speeches or articles; applies *Pickering*). Application of the *Pickering* doctrine may be affected, however, by whether the employer has applied a prior restraint, *see id*. at 467 n.11 (noting heavy burden on government to show reason for restriction, given broad ban on speech "before it is uttered"), or whether the employer's action is directed at speech or only at conduct that on a particular occasion has an expressive component.

Perhaps the City's English-only rule suffers from First Amendment shortcomings. But on the evidence and contentions presented by Plaintiffs, their challenge fails on the first and, probably, the third prongs of the *Pickering-Mount Healthy* test. They have not shown that their speech precluded by the English-only rule includes communications on matters of public concern. Nor have they produced evidence that the English-only rule was intended to limit communications on matters of public concern.

Under *Pickering* our first task is to determine what speech is at issue. That speech is the speech Plaintiffs are prevented from uttering because of the English-only rule—in other words, what Plaintiffs would utter if the English-only rule were set aside. As far as the record before us indicates, what they would say in Spanish if the rule were abolished is the sort of thing they had been saying before imposition of the rule, essentially mundane, quotidian conversation.

Rather than point to any specific statements, or types of statements, as communicating matters of public concern, Plaintiffs contend that the mere act of speaking in Spanish constitutes speech on a matter of public concern. They equate language choice with the expression of ethnic pride and argue that "'[P]laintiffs' interest in communicating ethnic pride . . . is not necessarily a matter only of private concern,'" Aplt. Br. at 57 (quoting *Latino Officers Ass'n v. City of New York*, 196 F.3d 458, 466 (2d Cir. 1999)), and that "one's choice of a

native tongue is considered 'symbolic speech' or 'pure speech.'" *Id.* But nothing in the record indicates that Plaintiffs' use of Spanish was in any way intended as, say, an expression of opposition to discrimination by the City. Indeed, there is no affidavit, or even an allegation in a complaint, that any Plaintiff's purpose in choosing to speak Spanish was to communicate anything to a supervisor, the public, or any policy maker. The letter to Mr. Nettles from Mr. Sanchez, for example, states that Hispanics are proud of their heritage and that they express that heritage by speaking Spanish to one another; yet it does not suggest that by speaking Spanish they are intending to communicate a message to outsiders (or even to their interlocutors) about a matter of public concern.

Plaintiffs' attorney has asserted that speaking Spanish is the equivalent of wearing a tee shirt on which is written "Proud to Be Hispanic." No evidence, however, supports an assertion that such a public statement was the intent of any Plaintiff. The First Amendment protection of Free Speech is concerned with *communication* not internal feelings. There is a fundamental distinction between taking pride in an act (an internal feeling) and *expressing* pride about performing the act (a communication). That one takes pride in performing an act does not mean that performing the act is in itself intended to communicate that one takes pride. We may assume that a football player takes pride in scoring a touchdown; but not until he performs a victory dance in the end zone can we say that he is

*expressing* pride in his prowess.  Likewise, an immigrant may be very proud that she can speak the language of her new country, but one would be surprised to learn that when she conducts a transaction at a department store in English, she is communicating pride in America or even pride in being able to speak English; the natural assumption is that the customer simply wants to buy a product and the purpose of carrying on a conversation in English is to accomplish that end. Plaintiffs failed to place on the record in this case evidence that their daily conversations in Spanish were meant to convey more than the substance of the words they uttered.  Nor did they produce evidence that their use of Spanish would be understood as a comment on race relations.  The context of speech includes the likelihood of the communication's being understood by the audience. If the listener does not understand the message, the communication can hardly inform the debate.  *See Moore*, 57 F.3d at 932.

Here, we do not question that Plaintiffs take pride in both their Hispanic heritage and their use of the Spanish language, nor do we question the importance of that pride.  What we do question, because there is no supporting evidence, is that by speaking Spanish at work they were intending to communicate that pride, much less "to inform [an] issue [so] as to be helpful . . . in evaluating the conduct of government." *Id*.  The dissent suggests that the Plaintiffs' conversations in Spanish must be viewed in the context of "an on-going and evolving discussion

-34-

on race relations." Diss. at 10. That context might be relevant if there were any indication that the Spanish-language conversations began only as part of that discussion. One might then infer that Plaintiffs were trying to make a point by conversing in Spanish. But nothing in the record suggests that this was the case. The race-relations controversy is irrelevant in determining the meaning of the decision to converse in Spanish if it had no impact on the decision. One hearing the conversation would have no reason to draw an inference that speaking in Spanish now conveyed some new meaning.

Accordingly, we need not address the focus of the dissent—whether ethnic pride or ethnic discrimination is a matter of public concern. Even if it is, Plaintiffs' use of Spanish is not protected, because their everyday use of Spanish was not intended, as far as the record shows, to *communicate* ethnic pride or opposition to discrimination. In all the cases cited by the dissent there was no question regarding what the employees were communicating. For example, in *Altman v. Minnesota Department of Corrections*, 251 F.3d 1199 (8th Cir. 2001), it was undisputed that reading the Bible during a training session on "Gays and Lesbians in the Workplace" was intended as a protest against the program.

In particular, *Latino Officers* is readily distinguishable. The conduct in that case undoubtedly intended to communicate a message, and do so in a very public forum. The Latino Officers Association sought to march in parades wearing their

-35-

police uniforms behind their organizational banner. Moreover, the district court found that "the message that plaintiffs seek to convey is not merely that they are proud to be Latino and police officers . . . , but that they are willing to criticize the NYPD publicly for alleged discrimination." *Latino Officers*, 196 F.3d at 465 (internal quotation marks omitted).

Nor can Plaintiffs find support in *Yniguez v. Arizonans for Official English*, 69 F.3d 920 (9th Cir. 1995) (en banc), *vacated as moot*, 520 U.S. 43 (1997). That opinion struck Article XXVII of the Arizona Constitution, which made English the official language of Arizona and prohibited the use of any other language in the performance of government business. Most notably, the prohibitions extended to interactions with members of the public who could not speak or understand English. The Ninth Circuit found the language limitation to be a matter of public concern because of the public's interest in receiving governmental services and information. *Id.* at 939-42. In contrast to Article XXVII, the English-only policy at issue here includes an exception "where it is necessary or prudent to communicate with a citizen, business owner, organization or criminal suspect in his or her native language due to the person or entity's limited English language skills." Pls.' Ex. L, R. Vol. II at 560. Even if we were to follow *Yniguez*, it says nothing about a requirement that bilingual public employees, such as Plaintiffs, speak English to one another.

Other First Amendment cases relied upon by Plaintiffs are likewise readily distinguishable as not involving public employees. *See Kikumura v. Turner*, 28 F.3d 592 (7th Cir. 1994) (summary denial of materials in Japanese language to a Japanese prisoner); *Thongvanh v. Thalacker*, 17 F.3d 256 (8th Cir. 1994) (ban on Laotian prisoner's receipt of non-English correspondence).

If the record contained evidence that Plaintiffs had used or intended to use the Spanish language to emphasize a point or otherwise communicate a message on a matter of public concern, this would be a different case. In that event, we would need to determine to what extent, if any, the City's English-only policy would need to be set aside to avoid First Amendment violations, just as the Supreme Court ruled invalid part of the statute restricting federal employees in *National Treasury*, 513 U.S. at 477-79. *See id*. at 485-89 (O'Connor, J., concurring in part and dissenting in part) (arguing for a more limited invalidation); *id*. at 501-02 (Rehnquist, CJ., dissenting) (same). On this record, however, Plaintiffs are not entitled to any partial invalidation of the policy on First Amendment grounds, nor would it be wise to attempt to delimit in detail the policy's proper boundaries.

Moreover, we question whether Plaintiffs' challenge could pass the third prong of the *Pickering-Mount Healthy* test, under which the "plaintiff must show her expression was a motivating factor in the detrimental employment decision."

*Schalk*, 906 F.2d at 494-95. How to translate this prong to the context of an ex

ante prohibition, as opposed to imposition of an ex post sanction, is not obvious.

But an employer should not necessarily be subjected to greater constraints by

codifying its rules rather than resorting to ad hoc responses. As expressed by

Justice O'Connor:

> In setting out the employees' interests in this case, the Court draws a meaningful distinction between the *ex ante* prohibition of certain kinds of speech and the *ex post* punishment of discrete, unforeseeable disturbances. There is some force to the Court's observation, because *ex ante* rules, in contrast to *ex post* punishments, carry risks of overinclusiveness and underinclusiveness. Nevertheless, reliance on the *ex ante/ex post* distinction is not a substitute for the case-by-case application of *Pickering*. There are many circumstances in which the Government as employer is likely to prefer the codification of its policies as workplace rules (which, incidentally, provide notice to employees) to the ad hoc, on-the-job reactions that have been standard fare in many of our employment cases. In most such circumstances, the Government will be acting well within its bounds. I see little constitutional difference, for example, between a rule prohibiting employees from being rude to customers, and the upbraiding or sanctioning of an employee *post hoc* for isolated acts of impudence. To draw the line based on a distinction between *ex ante* rules and *ex post* punishments, in my view, overgeneralizes and threatens undue interference with the government's mission as employer.

*Nat'l Treasury*, 513 U.S. at 481 (O'Connor, J., concurring) (internal citations and

quotation marks omitted).

The First Amendment is not violated when a public employer disciplines an

employee for speaking Spanish at work if the employer had no motive to quash

expression on a matter of public concern. It would seem to follow, therefore, that

-38-

an English-only rule does not violate the First Amendment if those imposing the rule lacked the intent to preclude communications on matters of public concern. Here, there appears to be no First Amendment violation because not only is there no evidence of any intent by City officials to quash such communications, but there is not even any evidence that they realized the English-only rule would do so. Indeed, given that Plaintiffs' most vigorous argument is that speaking Spanish is the equivalent of wearing a "Proud to Be Hispanic" tee shirt, it is ironic that the challenged work rule would not prohibit wearing such a shirt. Rather than voiding a rule because of an unintended and unexpected impact on communications on matters of public concern, we should at least await a specific challenge to the rule based on such an impact and determine whether the public employer would recognize exceptions. (We have no "data" on when the City would impose a sanction for violating the English-only rule other than that no one has been disciplined.)

In arguing against consideration in this case of the third prong of the *Pickering-Mount Healthy* test, the dissent cites several cases involving ex ante prohibitions on expression in which the reviewing courts considered only the first two prongs of the test. But we find them distinguishable. In *National Treasury*, 513 U.S. 454, the Supreme Court considered a ban on receiving payment for public speaking or publishing articles. In *Milwaukee Police Association v. Jones*,

192 F.3d 742 (7th Cir. 1999), police officers were barred from speaking about complaints against police department employees, and in *Harman v. City of New York*, 140 F.3d 111 (2d Cir. 1998), employees of social service agencies needed to obtain permission before talking to the media about the agency. *Weaver v. United States Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996), upheld a requirement that speeches and writings relating to foreign policy had to be precleared. Unlike the case before us, in each of these cases there could have been no question that the ex ante prohibition would apply to expression on matters of public concern. *See Nat'l Treasury*, 513 U.S. at 480 (O'Connor, J., concurring in part and dissenting in part) ("In contrast to some of our prior decisions, this case presents no threshold question whether the speech is of public, or merely private, concern.") The issue before us was not considered, and we do not believe that these cases constitute contrary authority.

Indeed, when this court recently considered an ex ante prohibition, we invoked the four-prong test. In *Belcher v. City of McAlester*, 324 F.3d 1203, 1205 (10th Cir. 2003), a city firefighter was reprimanded for violating a city policy prohibiting employees from privately contacting city council members and a fire department rule prohibiting contacting the council about city matters without prior authorization. We began our First Amendment analysis by quoting the *Pickering-Mount Healthy* test as set forth in *Schalk*, 906 F.2d at 494-95. *See id.*

-40-

at 1207.  We explained that *National Treasury* did not control the analysis

because the city's prohibition was "a far more narrowly tailored restriction on

speech than the statute at issue in [*National Treasury*]."  *Id*. at 1206 n.3.  The

English-only ban in this case could be similarly characterized.

Finally, we are aware that at the end of the section of their opening brief

entitled "A First Amendment Violation Was Shown**,"** Plaintiffs insert an

argument that the English-only policy violated due process by depriving them of

their constitutionally protected liberty interest in speaking a language of their

choice.  But we need not address this contention.  Plaintiffs' amended complaint

contains no reference to either a liberty interest or the Due Process Clause.

Accordingly, Defendants' motions for summary judgment did not address the

possibility of an argument based on such a theory.  Although Plaintiffs' responses

to the summary-judgment motions included a due-process argument, they did not

amend their complaint.  As a general rule, this court will not consider an issue

that was not adequately raised below.  *Walker v. Mather*, 959 F.2d 894, 896 (10th

Cir. 1992).

### E.    Individual Defendants

#### 1.    Qualified Immunity

Plaintiffs challenge the district court's grant of qualified immunity to the

individual defendants, City Administrator Nettles and Street Commissioner

Willis.  "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is available under both § 1983, *id.* at 609, and § 1981, *see Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 338 (5th Cir. 2003); *Patrick v. Miller*, 953 F.2d 1240, 1249-51 (10th Cir. 1992).

"We review the legal issues surrounding the grant of qualified immunity de novo, viewing all evidence in the light most favorable to [Plaintiffs] as the non-moving party."  *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001).

> Applying the same standards as the district court, we must determine whether the plaintiff has satisfied a heavy two-part burden.  The plaintiff must first establish that the defendant's actions violated a constitutional or statutory right.  If the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct.
>
> . . . If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity. . . . In short, although we will review the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.

*Gross v. Pirtle*, 245 F.3d 1151, 1155-56 (10th Cir. 2001) (internal quotation marks and citations omitted).

We have already held that Plaintiffs have produced sufficient evidence to sustain claims that they were denied statutory rights under § 1981 and constitutional equal protection.  Accordingly, we must address whether the rights at issue had been clearly established by 2002, when the English-only policy was adopted.  Assessing whether a right has been clearly established

> depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified.  For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.  Much the same could be said of any other constitutional or statutory violation.  But if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow*.

*Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  Accordingly,

> [Supreme Court] cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Id.* at 640.  It is not required that "the very action in question has previously been held unlawful; but . . . in the light of pre-existing law the unlawfulness must be apparent."  *Id.* (internal citation omitted).  We agree with the district court that the particularized right asserted by Plaintiffs is the right "to speak [a foreign language] in the workplace."  Dist. Ct. Order at 30.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992); *see also Wilson*, 526 U.S. at 617. Plaintiffs have not called to our attention, nor have we found, any cases from either the Supreme Court or this circuit establishing the right to speak a foreign language in the workplace. Further, published authority from other circuit courts suggests that English-only rules as applied to bilingual speakers are generally not discriminatory. *See Spun Steak*, 998 F.2d at 1490; *Garcia v. Gloor*, 618 F.2d 264, 266 (5th Cir. 1980). Thus, we affirm the district court's grant of qualified immunity to the individual defendants on Plaintiffs' claims under 42 U.S.C. § 1983. The individual defendants are likewise entitled to qualified immunity on Plaintiffs' claims under 42 U.S.C. § 1981. *See Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1244 (10th Cir. 2000) (applying qualified immunity analysis to § 1981 claims).

## 2.    Liability under Title VII

Finally, we note that although we have found sufficient grounds for Plaintiffs to proceed under their Title VII claims, the individual defendants may not be held liable under that statute. *See Haynes v. Williams*, 88 F.3d 898, 901

(10th Cir. 1996) ("[P]ersonal capacity suits against individual supervisors are inappropriate under Title VII").

## III. CONCLUSION

We REVERSE the district court's grant of summary judgment to the City on Plaintiffs' claims of (1) disparate-impact and disparate-treatment under Title VII; (2) intentional discrimination under 42 U.S.C. § 1981, and (3) denial of equal protection under 42 U.S.C. § 1983; and we REMAND for further proceedings on those claims. In all other respects the district court's judgment is AFFIRMED.

No. 04-6062, *Maldonado v. The City of Altus, Oklahoma*
**SEYMOUR, J.**, concurring in part and dissenting in part.

This is an unusual case, involving as it does an across-the-board *ex ante* ban on a public employee's right to speak in his native language while at work. While I join fully in the well reasoned opinion insofar as it reverses the district court's grant of summary judgment to the City on Plaintiffs' discrimination and equal protection claims, I am unable to endorse the majority's decision to affirm the district court with respect to Plaintiffs' First Amendment claim. Because I believe that the majority's application of the four-part *Mt. Healthy* test for retaliation is incorrect, and Plaintiffs' proposed speech involves a matter of public concern, I would reverse the district court's decision to the contrary and remand for further proceedings.

As the Supreme Court established in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), a governmental entity

> may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large. When a court is required to determine the validity of such a restraint, it must arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*United States v. Nat'l Treasury Employee's Union*, 513 U.S. 454, 465-66 (1995) (citations and quotations omitted). Unlike *Pickering*, *National Treasury* was not a case involving a First Amendment retaliation claim in which a government

employer allegedly took adverse employment action against its employee for a specific speech incident. Rather, it was a prior restraint case in which the plaintiffs were employees of the executive branch of the federal government challenging on First Amendment grounds a 1989 act of Congress prohibiting them from receiving compensation for appearing, speaking or publishing articles outside of work on subjects unrelated to their employment. *Id.* at 457-460. In that context, the Court did not consider the motivation of the government, *i.e.*, whether by enacting the ban on compensation it intended to curtail protected speech. Instead, the Court focused only on whether the speech at issue touched on a matter of public concern, and whether on balance the government employer's stated goals in prohibiting federal employees from receiving compensation for their speech activities outweighed the plaintiffs' and future employees' interests in speaking as citizens on matters of public concern. *Id.* at 468.

As in *National Treasury*, Plaintiffs contend the government, here the City of Altus, has imposed a prior restraint on speech. They claim the City's *ex ante* rule against speaking Spanish violates their First Amendment rights by chilling their speech before it occurs, not by punishing it after it has already taken place. The majority is wrong, therefore, to state as it does that in this case we apply a four-part test "[t]o determine whether a public employer has infringed the First

Amendment free-speech rights of an employee." Maj. op. at 29.[1] That test was established by the Supreme Court in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), a retaliation case. There, the Court first reiterated that

> whether speech of a government employee is *constitutionally protected* expression necessarily entails striking a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* at 284 (emphasis added, citations and quotations omitted). It is clear, therefore, that speech of a public employee is constitutionally protected if it meets

---

[1] This Circuit as well as our sister circuits have applied the four-part test cited by the majority only to First Amendment *retaliation* claims. *See, e.g., Belcher v. City of McAlester*, 324 F.3d 1203, 1205 (10th Cir. 2003); *Hulen v. Yates*, 322 F.3d 1229, 1237 (10th Cir. 2003); *Clinger v. N.M. Highlands Univ. Bd. of Regents*, 215 F.3d 1162, 1165 (10th Cir. 2000); *Gardetto v. Mason*, 100 F.3d 803, 811 (10th Cir. 1996); *see also Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 228-29 (6th Cir. 2005); *Gill v. Pidlypchak*, 389 F.3d 379, 380-82 (2d Cir. 2004); *Cygan v. Wis. Dep't of Corr.*, 388 F.3d 1092, 1098 (7th Cir. 2004); *Metzger v. DaRosa*, 367 F.3d 699, 702 (7th Cir. 2004); *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001); *McVey v. Stacy*, 157 F.3d 271, 277-78 (4th Cir. 1998); *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998); *Johnson v. Clifton*, 74 F.3d 1087, 1092 (11th Cir. 1996).

The majority states that in *Belcher* the court declined to apply the *National Treasury* test. Maj. op. at 39. In *Belcher*, however, the plaintiff challenged the reprimand received for engaging in allegedly protected speech. He did not challenge the city's *ex ante* rule prohibiting city employees from contacting city council members privately. The claim in *Belcher*, is fundamentally different from Plaintiff's claim in this case. The plaintiff in *Belcher* challenged an adverse employment action, whereas the Plaintiffs in this case challenge an *ex ante* prohibition. These are two different claims requiring two different tests.

-3-

the first two prongs of the *Pickering* test. It is only when the employee seeks to undo or receive damages for an adverse employment action that he must establish not only "that his conduct was constitutionally protected, *[but also]* that this conduct was a 'substantial factor' or to put it in other words, that it was a 'motivating factor' in the" government employer's adverse action against him. *Id.* at 287 (emphasis added). The latter requirement is the third prong of the four-part test which the Court developed in *Mt. Healthy* to analyze retaliation claims where a plaintiff has suffered an adverse employment action and seeks to show that the action came as a result of engaging in protected speech.

This case presents no such claim. Plaintiffs in the present case do not claim that they have been reprimanded, *see Belcher v. City of McAlester*, 324 F.3d 1203, 1205 (10th Cir. 2003), terminated, *see Schalk v. Gallemore*, 906 F.2d 491, 493 (10th Cir. 1990), suspended, *see Gardetto v. Mason*, 100 F.3d 803, 810 (10th Cir. 1996), or anything else. Instead they claim that the English-only rule constitutes prior restraint on speech. Therefore, we should apply the two-part test set forth in *United States v. Nat'l Treasury Employee's Union*, 513 U.S. at 465-66, namely, (1) whether Plaintiffs' decision to speak Spanish touches on a matter of public concern, and (2) whether the City's interest in regulating Plaintiffs' use

-4-

of Spanish outweighed the Plaintiffs' interest in speaking Spanish.[2]  *See*

*Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749-50 (7th Cir. 1999) (applying

hybrid *Pickering*/*National Treasury* test to government employees' First

Amendment challenge to *ex ante* regulations without requiring plaintiff to

establish motivation of the government); *Harman v. City of New York*, 140 F.3d

111, 117-18 (2d Cir. 1998) (same); *Weaver v. United States Info. Agency*, 87 F.3d

1429, 1439-40 (D.C. Cir. 1996) (same).

I also part company with the majority in determining whether Plaintiffs'

speech touched on a matter of public concern.  The majority states that Plaintiffs

have not pointed to any specific statements or types of statements they consider to

be of public concern.  I disagree with this characterization of the record.  While it

is true that Plaintiffs' complaint does not specifically allege that their banned

speech is of public concern, both Plaintiffs and the City fully addressed the public

concern issue in their summary judgment briefs.  Moreover, in its opinion, the

---

[2] The majority states that *National Treasury* is inapposite because in that case there was no question that the employees' speech constituted a matter of public concern.  Maj. op. at 38-39.  It is true that the Court agreed in *National Treasury* that the employees' speech involved matters of public concern.  But the question of whether speech touches on a matter of public concern is not determinative as to whether the case is properly characterized as an *ex ante* prior restraint case requiring application of only the two-part test, or as a *post hoc* retaliation case requiring application of the four-part *Pickering-Mt. Healthy* test.  The four-part test is only applicable if Plaintiffs allege an adverse employment action or a detrimental employment decision.  Plaintiffs in *National Treasury*, like the Plaintiffs in this case, made no such allegations.

district court recognized that Plaintiffs had characterized the "content" of their speech as ethnic pride. Aplt. App., vol. III at 897. Having so recognized, the court then held that "Plaintiffs have not shown that their pride in their Hispanic heritage . . . is a matter of concern to the general public so as to merit First Amendment protection." *Id.* It is therefore reasonable to assume that the alleged "content" of Plaintiffs' speech, namely, their choice to converse in Spanish rather than English, is pride in their cultural and ethnic identity and heritage. Plaintiffs have thus indicated that their desire to speak Spanish is, itself, a matter of public concern.

In arguing that their choice of language is itself a statement of public concern, Plaintiffs find support in *Hernandez v. New York*, 500 U.S. 352 (1991), an opinion addressing a criminal defendant's challenge to the prosecutor's explanation for striking two Hispanics from a pool of prospective jurors. In *Hernandez*, the prosecutor's stated reason for striking the jurors was that they were bilingual and the prosecutor was not certain they would accept a translator's statement of the witnesses' testimony. *Id.* at 356. In holding that the prosecutor's explanation was race-neutral, the Court recognized the power of language (as well as a person's decision to speak a particular language as opposed to another) to convey special meaning as well as to engender conflict and disclose bigotry. The Court wrote:

> Language permits an individual to express both a personal identity and membership in a community, and those who share a common language may interact in ways more intimate than those without this bond. Bilinguals, in a sense, inhabit two communities, and serve to bring them closer.
>
> . . . .
>
> Just as a shared language can serve to foster community, language differences can be a source of division. Language elicits a response from others, ranging from admiration and respect, to distance and alienation, to ridicule and scorn. Reactions of the latter type all too often result from or initiate racial hostility.

*Id.* at 370-71 (plurality opinion). The Ninth Circuit expressed a similar understanding of the important connection between language and ethnic identity in *Garcia v. Spun Steak Co.*, 998 F.2d 1480 (9th Cir. 1993), when it said, "[i]t cannot be gainsaid that an individual's primary language can be an important link to his ethnic culture and identity." *Id.* at 1487.

While these two opinions did not address First Amendment issues, they provide support for the proposition that a person's choice of language can convey a message – and a powerful one at that. They also support the proposition that language choice and ethnic or cultural identity can be inextricably intertwined both in the mind of the speaker and in the minds of those who hear him. As the Court recognized in *Hernandez*, that linkage between language and ethnic identity can elicit not only a sense of familiarity or solidarity, but discomfort or even hostility, from a speaker's audience.

-7-

Plaintiffs cite *Latino Officers Ass'n, New York City, Inc. v. City of New York*, 196 F.3d 458, 466 (2d Cir. 1999), for the proposition that a group's "interest in communicating ethnic pride," whether through choice of language or by marching in a parade as the plaintiffs in *Latino Officers Ass'n* did, may be a matter of public concern. Whether a statement or other form of speech by a public employee communicating ethnic pride is a matter of public concern requires us to assess "the content, form, and context" of the given statement or form of speech, "as revealed by the whole record." *Connick v. Meyers*, 461 U.S. 138, 147-48 (1983). In determining whether speech "touches on a matter of public concern," a court should ascertain "whether it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1113 (10th Cir. 2004) (quoting *Burns v. Bd. of County Comm'rs*, 330 F.3d 1275, 1286 (10th Cir. 2003)).

With these instructions in mind, I turn to the facts alleged by Plaintiffs in the present case. The district court found and the majority agrees that Plaintiffs identify the message of their proposed speech to be pride in their ethnic heritage. Plaintiffs analogize their use of Spanish to wearing tee-shirts to work proclaiming "proud to be Hispanic!" Aplt. Br. at 57. The district court held that Plaintiffs failed to show statements of ethnic pride akin to the wearing of a tee-shirt are matters of public concern requiring protection under the First Amendment. But

-8-

*Connick* and its progeny instruct us that the form speech takes (here, choice of language) and the context in which it is spoken are just as important as content. Moreover, *Connick* instructs that context is revealed by the record as a whole.

Plaintiffs' strongest characterization of their speech can be found in a letter written by Tommy Sanchez and co-signed by Rueben Rios and Lloyd Lopez. Aplt. App., vol. II at 521-23. The letter is addressed to defendant city administrator, Michael Nettles, and copied to the City's mayor and attorney. Writing on June 18, 2002, Mr. Sanchez informed Mr. Nettles that his subordinates, Mr. Rios and Mr. Lopez, were recently instructed by their supervisor, defendant Holmes Willis, that they were no longer permitted to speak Spanish while they are at work. Mr. Sanchez noted he had been previously unaware of any English-only rule for City employees and, therefore, decided to question Mr. Willis about it directly. This conversation, wrote Mr. Sanchez, first alerted him to the apparent intention of the City to adopt this new English-only policy and apply it citywide. When he asked Mr. Willis why such a policy was necessary, Mr. Willis told him Mr. Nettles believed that the use of Spanish by certain city employees "needed to stop" because "it was making others feel uncomfortable." *Id.* at 521. Mr. Willis informed him that "the only reason that *we* (Hispanics) speak Spanish to each other is because it reflects our insecurities." *Id.* Mr. Sanchez then wrote: "In my many years with the City of Altus, I have

never seen a policy be issued to restrict hispanics [sic] *from expressing our heritage* by speaking our native language to each other, as this new policy now imposes." *Id.* at 522 (emphasis added). Finally, Mr. Sanchez ended: "I prayfully [sic] request that the City of Altus understand that we Hispanics are proud of our heritage and do not feel that our ability to communicate in a bilingual manner is a hindrance." *Id.* at 523. Significantly, Mr. Sanchez made clear that the purpose of the letter was to formally file a discrimination complaint against the city on the behalf of Mr. Rios and Mr. Lopez, objecting to the proposed English-only policy. Less than one month after Mr. Sanchez wrote the letter, the City summarily adopted the English-only requirement.

Before litigation challenging the legality of the City's English-only policy ever commenced, therefore, in a plea for understanding and reconciliation, Mr. Sanchez himself characterized the content of the prohibited speech as an expression of community identity and ethnic heritage, of solidarity and pride, in the face of contravening forces. In other words, an apter analogy may be wearing a tee-shirt proclaiming "proud to be a Yankees fan" to a rally for the Boston Red Sox, because that analogy describes the context as well as the content of the speech.

With respect to context, the record contains evidence of months of tension between Hispanic and non-Hispanic City employees. Prior to the adoption of the

English-only policy, several Hispanic employees had filed complaints of discrimination and retaliation. The City, in response, had hired an outside human resources consultant to investigate the complaints and the severity of the situation and report back to the City Council. The record thus establishes that numerous individuals, both Hispanic and non-Hispanic, were involved in an on-going and evolving discussion on race relations, and that all levels of City government were involved, including the mayor, the City administrator, the City's director of human resources, and many City department heads and supervisors. The record further indicates the general public was aware of and interested in the English-only policy and its effects. Contained within the record are several news articles on the City's English-only policy, for which public employees on both sides of the debate were interviewed. In one such article, the mayor was quoted as referring to the Spanish language as "garbage." That he later claimed in his deposition to have been misquoted is irrelevant to the question of whether his misquote further inflamed public debate over the English-only policy and its perceived intent. Moreover, the mayor's testimony that he eventually apologized to the City council for the misquote underscores the seriousness and the pervasiveness of the whole issue, namely, the apparently degenerating relations between Hispanics and non-Hispanics in the City of Altus. At a certain point then, this dispute evolved from a situation involving City employees to a wider discussion of discrimination, race

-11-

relations, and the power of expressions of ethnic identity to elicit strong emotions on either side.

In sum, this is not a case about a single employee wearing a tee-shirt proclaiming "proud to be Hispanic!" or "proud to be Irish!" or "proud to be Vietnamese!" This is a case about a large group of employees (twenty-nine Hispanic City employees) desiring to wear such tee-shirts when an even larger number of their fellow employees are wearing (or perceived to be wearing) tee-shirts proclaiming "annoyed by Hispanics!" or "sick and tired of the Irish!" or "threatened by Vietnamese!" The record suggests this was a situation in which the right to speak one's chosen language became an expression of pride and resistance and identity. In a City where a sizable number of citizens identifies strongly with one side or the other, it is nonsensical to conclude as the majority does that Plaintiffs' use of Spanish would not be "uttered with an eye to action, to improve the public welfare," but was instead meant only "to remedy a personal grievance." Maj. op. at 30. Indeed, it is unclear to me why the fact that twenty-nine City employees share the same race-related grievance does not foreclose any characterization of this complaint as mere "personal concern."

In addition to the specific facts alleged in this case strongly suggesting the existence of a broad City-wide discussion of ethnicity, identity, and discrimination, numerous courts have found that otherwise "personal" statements

of ethnic, racial or religious identity or expressions of sexual orientation constitute speech touching on matters of public concern. In *Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199 (8th Cir. 2001), the court held that for the purposes of their First Amendment claim, Department of Corrections employees were speaking on matters of public concern when they silently read their Bibles during a mandatory training program entitled "Gays and Lesbians in the Workplace." The court rejected the defendants' argument that the employees did not engage in speech on a matter of public concern because their speech was "concerned only with internal policies or practices which are of relevance only to the employees of that institution." *Id.* at 1202 (citations omitted). While agreeing with the defendants that the issue, namely, the appropriateness of the training program and its mandatory nature, was "inherently 'internal,'" the court went on to state that "the way in which the Department [of Corrections] . . . deal[s] with issues of gays and lesbians in the workplace affects the performance of [the Department's] public duties and is a matter of political and social concern to the general public." *Id*. The court pointed to the role played by the defendants in changing what otherwise may have been merely an internal matter into a matter of public concern by making the training program mandatory. In doing so, the court was persuaded the defendants "created a context in which employees speaking out in opposition

-13-

to their public employer's handling of this social issue should be considered speech on a matter of public interest and concern." *Id*.

In my judgment, there are no meaningful grounds upon which to distinguish the facts in *Altman* from those in the present case. Like the public employees' speech in *Altman*, namely, their reading of the Bible during a mandatory employment program, Plaintiffs' speech, namely, their conversing in Spanish as opposed to English, conveys their strong identification with a particular viewpoint and position and their opposition to the City's contrary policy. Like the way the Department of Corrections handles the issue of gays and lesbians in the workplace, the way in which the diverse City of Altus deals with the issue of cultural, ethnic and linguistic diversity in the workplace "is a matter of political and social concern to the general public." *Id*. And just as the Department of Corrections in *Altman*, by making its program mandatory, created a context in which its employees' Bible reading became speech on a matter of public concern rather than simply an internal grievance, the City, by virtue of adopting a mandatory English-only policy in the midst of complaints about discriminatory practices against Hispanics, rendered Plaintiffs' use of Spanish at the workplace speech that touches on a matter of public concern.

In another analogous case, the court held that the employees' speech touched on a matter of public concern because it occurred in the midst of the

-14-

nation's "long, continuing debate over the desirability of community racial integration in this country." *Locurto v. Giuliani*, 269 F. Supp. 2d 368, 386 (S.D.N.Y. 2003). In *Locurto*, plaintiffs who were terminated from their jobs as New York City police officers and firemen argued that their appearance in a Labor Day parade on a float entitled "Black to the Future," wearing black-face and engaging in various racially offensive pantomimes, was speech on a matter of public concern to the extent that it was a commentary on their community's increasing racial integration. *Id.* at 385. While noting that the plaintiffs' speech was distasteful and engendered considerable conflict, the court was clear that whether a speaker speaks on the side of the angels or the devils does not matter for the purpose of determining whether the speech touches on a matter of public concern. *Id.* at 386. Rather, the court said the determination must turn on how broad the context is in which the speech occurred, and how many people, beyond the plaintiffs themselves, are involved in or may be impacted by the broader discussion. *Id.* at 387-88. Similarly, in assessing the context surrounding Plaintiffs' speech in the present case, we must consider the evidence of an on-going, wide-ranging debate over diversity, involving dozens of individuals and City policy makers.

Three additional public employee First Amendment opinions are instructive. *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204 (9th Cir. 1996), and

*Nichol v. Arin Intermediate Unit 28*, 268 F. Supp. 2d 536 (W.D. Pa. 2003), both address claims by public employees that their government employers violated their First Amendment rights by enacting policies prohibiting certain forms of overtly religious expression.  In both cases, the courts held that speech touching on deeply-felt religious identity constituted speech regarding a matter of public concern.  *Tucker*, 97 F.3d at 1210 (challenging ban on religious speech and decorations in the workplace); *Nichol*, 268 F. Supp. 2d at 557-60 (challenging ban on religious jewelry or ornamentation in the workplace).  Similarly, both courts noted that while the plaintiffs' religious identities and viewpoints were inherently personal, the fact that their identities and viewpoints were shared by a significant number of fellow citizens, both locally and nationally, rendered their expression of their identities and viewpoints, especially in the face of controversy and suppression, matters of public concern.

Another analogous case, *Weaver v. NEBO Sch. Dist.*, 29 F. Supp. 2d 1279 (D. Utah 1998), dealt with a school district's order prohibiting the teacher plaintiff from identifying herself as a lesbian and discussing her homosexuality outside of the classroom.  In rejecting the defendants' argument that the plaintiff could not demonstrate her sexual orientation was a matter of public concern, the court noted that "[c]ertain issues may be considered 'inherently of public concern.'"  *Id.* at 1284 (quoting *Connick*, 461 U.S. at 148 n.8).  In support of

including sexual orientation in the list of matters to be considered "inherently of public concern," the court noted that "[s]everal legal authorities have suggested that one's identity as a homosexual–even though it is in essence a private matter–is inherently a matter of public concern because it necessarily and ineluctably involves that person in the ongoing public debate regarding the rights of homosexuals." *Id.* (internal quotation marks omitted). Furthermore, as in *Altman*, the court in *Weaver* pointed to the defendants' role in making the plaintiff's speech a matter of public concern. *Id.* The plaintiff's sexual orientation in *Weaver* was a topic of conjecture, rumor and indignation long before she ever spoke publically about being a lesbian, and the court noted that numerous government officials were involved in deciding what, if anything, should be done about the plaintiff's desire to identify herself as homosexual. Thus, "defendants' actions converted this issue to a matter of public concern." *Id.*

Just as the *Tucker* plaintiff's religious cubicle decorations and the *Nichol* plaintiff's gold cross constituted speech proclaiming their identities as Christians and their pride in that identity, Plaintiffs' use of Spanish in the present case proclaims their identities as Hispanics and their pride in that identity. And just as the courts in *Tucker*, *Nichol* and *Weaver* found that the plaintiffs' controversial identities "necessarily and ineluctably" involved them in the ongoing public

debates regarding the separation of church and state, religious rights, and the rights of homosexuals, Plaintiffs' identities as Hispanic (made "controversial" by the allegedly racially-charged atmosphere in the City of Altus) involved them in the ongoing public debate over diversity in America and linguistic integration. Moreover, just as the courts in *Tucker*, *Nichol* and *Weaver* held that debate over those plaintiffs' identities rendered their speech a matter of public concern, the ongoing public debate over Plaintiffs' use of Spanish to convey pride in their identities makes their expressions of that identity a matter of public concern.

Significantly, the majority itself, me included, recognizes that a reasonable person could read the City's English-only policy as creating or contributing to a racially discriminatory hostile work environment. Maj. op. at 18. Thus, we say, "[t]he very fact that the City would forbid Hispanics from using their preferred language could reasonably be construed as an expression of hostility [by the City] to Hispanics." *Id.* at 18-19. Whether the City of Altus has created a racially hostile work environment is clearly a matter of public concern.

Nor do the opinions cited by the majority dictate a different outcome. The majority relies on this court's opinion in *Moore v. City of Wynnewood* for the proposition that "[a]n employee's speech must not merely relate generally to a subject matter that is of public interest, but must 'sufficiently inform the issue as to be helpful to the public in evaluating the conduct of the government.'" 57 F.3d

924, 932 (10th Cir. 1995) (quoting *Wilson v. City of Littleton, Colo.*, 732 F.2d 765, 768 (10th Cir. 1984)). The record shows that Plaintiffs' speech was actually the focal point of ongoing local concern. Mr. Sanchez copied his letter complaining of the English-only policy to the mayor and the City attorney. The mayor was quoted as referring to the Spanish language as "garbage." In other words, the debate itself over the right of City employees to speak Spanish at work was made public and reflected the City's conflicted attitude toward linguistic and ethnic diversity in general. The City's prohibition of Spanish in the workplace and Plaintiffs' resistance to that prohibition more than sufficiently informs the issue of race relations in the City of Altus "as to be helpful to the public in evaluating the conduct of [the City] government." *Id.*

The majority's reliance on language in this court's opinion in *Gardetto v. Mason*, 100 F.3d 803, does not dictate a different outcome. We held there that "[i]n deciding how to classify particular speech, courts focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it ha[s] a broader public purpose." *Id.* at 812. In making this judgment, we emphasized that "we must evaluate whether Gardetto spoke out based on the same motivation that would move the public to speak out." *Id.* Focusing on the motive of Plaintiffs in the present case, the record shows that their desire to speak Spanish while at work

points to a desire to show pride in their heritage and cultural identity in the face

of contravening forces and even hostility. It is, as Mr. Sanchez asserts in his

letter, an effort to show they are not embarrassed by their ability to speak Spanish

and their membership in a minority class. In light of these declared motives, it is

hard to see how their speech is calculated merely to redress personal grievances.

While Plaintiffs are clearly aggrieved on a deeply personal level, that fact does

not militate a conclusion that their speech does not also have a far broader public

purpose, that is, to take a stand on a divisive issue in this society.[3]

---

[3] The issue, moreover, appears to grow increasingly divisive every year. Prior to 1981, only two states had laws declaring English their official language, but by 1996, twenty-two states and forty municipalities had enacted English language legislation. Brian L. Porto, Annotation, *"English-Only" Requirement for Conduct of Public Affairs*, 94 A.L.R. 5th 537, § 2 (2004). As of 2003, twenty-three states had enacted some form of English language legislation, and since 2000, courts in Alaska, Utah, Oklahoma and Iowa have addressed their validity. *See* Kenya Hart, *Defending Against A "Death by English": English-Only, Spanish-Only, and a Gringa's Suggestions for Community Support of Language Rights*, 14 BERKELEY LA RAZA L.J. 177, 178-79, 187 (2003). In an opinion decided in 2002, the Supreme Court of Oklahoma ruled that an initiative petition proposing a state-wide English-only statute was constitutionally flawed because the proposed law ran afoul of the state constitution's free speech provisions. *In re Initiative Petition No. 366*, 46 P.3d 123, 125-28 (Okla. 2002). In announcing its decision, the court noted the intensity of the state-wide debate sparked by the initiative. *Id.* at 125. Moreover, powerful public policy groups on both sides of the debate continue to marshal substantial resources to support or defeat English-only legislation at the national, state and municipal levels. *See* Hart, *supra*, at 178-79; *see also* Michael Albert Thomas Pagni, *The Constitutionality of English-Only Provisions in the Public Employee Speech Arena: An Examination of* Yniguez v. Arizonans for Official English, 24 HASTINGS CONST. L.Q. 247, 248-49 (1996); Margaret Robertson, *Abridging the Freedom of Non-English Speech:*

(continued...)

Finally, the majority states that, in its estimation, the record indicates "if [the City's English-only] rule were abolished" Plaintiffs' speech would consist of the same "sort of thing they had been saying before imposition of the rule, essentially mundane quotidian conversation." Maj. op. at 31. That very well may be true. Whether Plaintiffs discussed what they plan to eat for lunch or the upcoming City elections, my analysis of the content of their speech for purposes of the First Amendment would remain the same because the content of ethnic pride in the context of this case does not originate in the words spoken, but in the language used to speak them.

The majority also asserts that, even if Plaintiffs' choice of language was intended to convey ethic pride, the record does not contain evidence showing that any of the Plaintiffs attempted to communicate this message to the public or to any policymaker. In so doing, the majority recognizes that "[i]f the record contained evidence that Plaintiffs had used or intended to use the Spanish language to emphasize a point or otherwise communicate a message on a matter of public concern, this would be a different case." Maj. op. at 36.

I disagree with the majority's characterization of the record. Mr. Sanchez's letter to the city administrator asserted that by the very act of speaking Spanish to

---

[3](...continued)
*English-Only Legislation and the Free Speech Rights of Government Employees*, 2001 BYU L. REV. 1641, 1641-42.

one another, Hispanic City employees are "expressing [their] heritage." Aplt. App., vol. II at 521-23. Characterizing the record in the light most favorable to Plaintiffs, as we must on summary judgment, *see Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980), this declaration undercuts the majority's curious distinction between "taking pride in an act and *expressing* pride about performing the act." Maj. op. at 32 (emphasis in original). In his letter, Mr. Sanchez points out that he and other Hispanics are proud of their heritage and that their use of Spanish is a means of *expressing* that pride. In other words, the "victory dance in the end zone," namely, the public expression of pride, is the Plaintiffs' decision to speak Spanish while on the job, openly, and, perhaps in light of alleged discrimination, even defiantly. If Plaintiffs were merely *taking* pride in their ability to speak Spanish and their Hispanic heritage, they would be content to speak Spanish solely in their own homes. Their public use of Spanish while at work, on the other hand, conveys more than a private and merely personal pride. Rather, it is the *expression* of that pride.[4]

---

[4] By way of illustrating its argument, the majority presents the example of an immigrant speaking English to an English-speaking store clerk, stating that the store clerk

> one would be surprised to learn that when [the immigrant] conducts a transaction at a department store in English, she is communicating pride in America or even pride in her ability to speak English;

(continued...)

-22-

Moreover, the majority is incorrect insofar as it suggests Plaintiffs were required to convey their message to a policymaker or to the public. *See* maj. op. at 32-33. The Supreme Court has held that speech need not be communicated to a policymaker or addressed to the public in general to be classified as speech on a matter of public concern for purposes of the *Pickering* test. In *Rankin v. McPherson*, 483 U.S. 378, 386 (1987), the Court held that a public employee's off-hand private remark to a co-worker was protected by the First Amendment because the remark, namely, criticism of presidential policies and a hope that the

---

[4](...continued)
[instead] the natural assumption is that the customer simply wants to buy a product and the purpose of carrying on a conversation in English is to accomplish that end.

Maj. op. at 33. The problem with this illustration is it devalues the speaker's motives, rendering an evaluation of the speech completely dependant on the listener's ability or willingness to interpret it. Even if Plaintiffs' English-speaking co-workers did not interpret Plaintiffs' use of Spanish as an expression of their ethnic pride, a court must look to the motive of the speaker, not the reaction of the listener, in determining whether speech was on a matter of public concern. *Gardetto*, 100 F.3d at 814 ("The controversial character of a statement is irrelevant to the question of whether it deals with a matter of public concern, . . . because the focus is on the motive of the speaker." (internal citation and quotation marks omitted)). Just as a co-worker of the plaintiff in *Nichol v. Arin Intermediate Unit 28*, 268 F. Supp. 2d 536 (W.D. Pa. 2003), could see Ms. Nichol's gold cross necklace as merely a piece of personal adornment, an English-speaking City employee potentially could view Plaintiffs' use of Spanish as nothing more than a means to accomplish an end – the use of language to convey a request, a question, or a command. The pertinent inquiry here as in *Nichol*, however, is not whether Plaintiffs actually succeeded in expressing pride in their identity, but whether pride in their identity was the *motive* for their expression and whether pride in their identity is a matter for public concern.

president might be assassinated, considered in the broader context of national debate, "plainly dealt with a matter of public concern." The fact that the employee's private statement was never intended to be public did not affect the Court's determination that it nonetheless touched on a matter of public concern. Instead, the Court considered the larger context in which the speech took place – an atmosphere of wide-spread news coverage of an assassination attempt and speculation as to the popularity of the president's policies – in determining its nature for First Amendment purposes. In addition, in *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415-16 (1979), the Court held that although a teacher complained privately to the school principal about the school district's efforts to desegregate, her speech nevertheless constituted a matter of public concern. *See also Gardetto*, 100 F.3d at 815 ("We note that private communications on matters of public interest are entitled to First Amendment protection; an employee need not remonstrate publicly to bring his comments under the aegis of the First Amendment. Private communications are often the most effective way to bring about policy changes and the least disruptive to the delivery of government services." (internal citations omitted)). Here, Mr. Sanchez complained to the city administrator in a letter that was copied to the mayor. Surely these officials constitute policymakers for defendant City.

Thus, contrary to the majority's apparent reliance on the absence of evidence in the record showing that Plaintiffs' use of Spanish was intended to communicate ethnic pride to the public, the Supreme Court has held that the private-nature of speech is not a determinative factor as to whether the speech touches on a matter of public concern. Rather, inquiries into the public versus private-nature of speech go to the *context* of the speech, not its content. The content of speech may touch on a matter of public concern even if the speech took place in a private context, as long as the content of the speech (in the present case, ethnic pride) "implicate[s] the political or social concerns of the community." *Gardetto*, 100 F.3d at 815. Conversely, speech that occurs in public can touch on matters solely of private concern. If, under *Rankin*, an off-hand (and even offensive) remark made in passing to one's co-worker can be considered speech touching on a matter of public concern, it is unclear to me why Plaintiffs' use of Spanish while on the job, every day, in numerous settings and on countless subjects, also does not deserve First Amendment protection as long as it touches on a matter of public concern, namely, ethnic pride and solidarity in a community with a sizeable minority of fellow Hispanics and in a nation currently debating the merits of bilingual workplaces.

In conclusion, it is important to remember what this case is *not* about. This is not a case involving the sole complaint of one employee in a City with no

history of racial tensions. This not a case involving one employee's complaint against one or two of his supervisors. This is a case involving more than two dozen employees in a diverse workforce in a City with a recent history of racial and national origin discrimination complaints. This is a case in which the City, fully cognizant of that history, nonetheless adopted a broadly-sweeping policy that its director of human resources admitted in her deposition testimony could offend Hispanic employees and further inflame racial tensions. Aplt. App., vol. II at 547-49. This is a case in which we have upheld, for summary judgment purposes, Plaintiffs' race and national origin discrimination claims against the City for restricting the very speech Plaintiffs want to use. In light of these facts, it seems incorrect to characterize Plaintiffs' expression of pride in their ethnic identity as reflecting merely "personal" or "internal" grievances. It is also difficult to see how that expression of pride does not add to the public debate on diversity or "sufficiently inform" the public that there are two equally vocal and passionate sides to that debate. Accordingly, I cannot agree with the majority's statement that Plaintiffs' proposed speech in Spanish would not be "uttered with an eye to action" or intended to "improve the public welfare." Maj. op. at 30. To the contrary, Plaintiffs' have expressed a desire to speak Spanish in order to sustain their community's history of linguistic and ethnic diversity and to preserve that history in the everyday details of their lives. The City's ban on Spanish from

the work place creates a public space where Spanish speakers arguably do not feel welcome.  In such a context, it is not hard to imagine the power of a simple "buenos dias" to convey resistance to that effort and hope for the future.

Thus, I respectfully dissent from the majority's view that such speech in this case does not touch on a matter of public concern.  I would remand this issue to the district court for further consideration in light of *National Treasury*.